YOUNGBLOOD TRUCK LINES, INC., and Common Carrier Conference—Irregular Route, Plaintiffs,

v.

UNITED STATES of America and Interstate Commerce Commission, Defendants.

Civ. No. 2091.

United States District Court
W. D. North Carolina,
Asheville Division.

Heard July 29, 1963.

Decided Sept. 16, 1963.

©⟶108

H. Charles Ephraim and James E. Wilson, Washington, D. C. and Robert R. Williams, Jr., Asheville, N. C., for plaintiffs.

Lee Loevinger, Asst. Atty. Gen., and John H. D. Wigger, Atty., Dept. of Justice, Washington, D. C., and William Medford, U. S. Atty., Asheville, N. C., for defendant the United States.

Robert W. Ginnane, Gen. Counsel, Interstate Commerce Commission and Robert S. Burk, Atty., Interstate Commerce Commission, Washington, D. C., for defendant Interstate Commerce Commission.

Before J. SPENCER BELL, Circuit Judge and CRAVEN, and WARLICK. District Judges.

CRAVEN, Chief Judge.

Pursuant to 28 U.S.C.A. § 2325, a three-judge court was convened in accordance with 28 U.S.C.A. § 2284 to hear and determine this action to permanently enjoin, set aside, or annul certain orders of the Interstate Commerce Commission.

Youngblood Truck Lines, Inc. (hereinafter referred to as "Youngblood") is a common carrier by motor vehicle of property in interstate commerce pursuant to duly issued certificates of operating authority. Common Carrier Conference—Irregular ˙Route, Inc., is a non-profit organization of which Youngblood is a member.

Involved in this proceeding are three separate and distinct grants of authority held by Youngblood which allow it to operate over irregular routes between the following points respectively:

I. Between points in Georgia on and north of a line beginning at the Alabama-Georgia state line and extending along Georgia Highway 20 to U. S. Highway 41, thence along U. S. Highway 41 to Atlanta, Georgia, thence along U. S. Highway 29 to Athens, Georgia, and thence along U. S. Highway 78 to the Georgia-South Carolina state line (hereinafter referred to as "North Georgia"), *on the one hand*; and, on the other, points in Buncombe, Graham, Haywood, and Henderson Counties in North Carolina.

II. Between points in North Caroline on and west of U. S. Highway 1, *on the one hand*; and, on the other, *all* points in South Carolina.

III. Between Tryon, North Carolina, and points in North Carolina within ten miles of Tryon (which includes part of Hender-

son County), *on the one hand*; and, on the other, points in North Carolina on and west of U. S. Highway 1.

By "tacking" (combining) these separate grants of authority, Youngblood is permitted to perform the following services: (1) by "tacking" authorities numbered I and II at a point in Henderson County, North Carolina, Youngblood can operate (through a commonly contiguous "gateway" point) between North Georgia, on the one hand; and, on the other, all points in South Carolina; (2) by "tacking" the authorities numbered I and III at a point in Henderson County within ten miles of Tryon, North Carolina, Youngblood can operate between North Georgia, on the one hand; and, on the other, points in North Carolina on and west of U. S. Highway 1.

Under the above grants of authority, Youngblood cannot provide direct line service between North Georgia, on the one hand, and, on the other, points in North Carolina on and west of U. S. Highway 1 and points in South Carolina,

but must follow a circuitous route through a "gateway" in Henderson County, North Carolina.

By application filed July 20, 1960, with the Interstate Commerce Commission, Youngblood sought a certificate of public convenience and necessity authorizing direct line operations between North Georgia, on the one hand, and, on the other, fifteen specified counties in northwestern South Carolina.[1] The purpose of Youngblood's application was two-fold: (1) elimination of the Henderson County "gateway" requirement relative to service between North Georgia and the designated fifteen counties in South Carolina; and, (2) elimination of the observation of a "gateway" at a point in Henderson County within ten miles of Tryon, North Carolina, in operations between North Georgia and that part of North Carolina on and west of U. S. Highway 1, this latter gateway elimination to be achieved by tacking the authority that would be derived from (1). Were Youngblood's application granted, the following mileage savings, among others, would result:

| BETWEEN | AND | MILEAGE SAVINGS |
|---|---|---|
| Greer, S. C. | Atlanta, Ga. | 21 to 23% |
| Charlotte, N. C. | Rabun Gap, Ga. | 16% |
| Charlotte, N. C. | Dahlonega, Ga. | 19 to 20% |
| Kernersville, N. C. | Elberton, Ga. | 15% |
| Atlanta, Ga. | Anderson, S. C. | 44% |
| Athens, Ga. | Anderson, S. C. | 70% |
| Gainesville, Ga. | Anderson, S. C. | 55% |
| Atlanta, Ga. | Newberry, S. C. | 29% |
| Athens, Ga. | Newberry, S. C. | 50% |
| Gainesville, Ga. | Newberry, S. C. | 32% |
| Atlanta, Ga. | Rock Hill, S. C. | 21% |
| Athens, Ga. | Rock Hill, S. C. | 29% |
| Gainesville, Ga. | Rock Hill, S. C. | 22% |
| Atlanta, Ga. | Seneca, S. C. | 50% |
| Athens, Ga. | Walhalla, S. C. | 40% |
| Gainesville, Ga. | Seneca, S. C. | 30% |
| Atlanta, Ga. | Abbeville, S. C. | 71% |
| Gainesville, Ga. | Abbeville, S. C. | 55% |

---

1. Cherokee, Union, Laurens, Spartanburg, Greenville, Anderson, Pickens, Oconee, Abbeville, Greenwood, Lancaster, Chester, York, Fairfield, Newberry.

Youngblood calculates that its average cost of operating an over-the-road tractor-trailer unit is 26.964 cents per mile; that under the new route authority sought by this application, it would save approximately 1,400 miles a week in its movements; that its annual dollar savings in operating expenses would exceed $20,000.00.

Since the authority sought involved less than three states, it was mandatory that the matter be referred to a Joint Board consisting of representatives of the states involved. 49 U.S.C.A. § 305 (a). Five competing motor carriers protested the application and appeared before the Board at its hearing.[2] Youngblood's only witness at the hearing was its President and General Manager, Mr. J. C. Youngblood.

■ An exhaustive statement of facts is included in the Joint Board's Report. The Commission adopted the same facts as its own. Since Youngblood makes no contention that the facts are otherwise, this court likewise adopts them as the evidence upon which this case must turn. The scope of judicial review of an Interstate Commerce Commission order includes consideration of whether the ultimate conclusions of the Commission are supported by substantial evidence on the record considered as a whole, are free from errors of law, and are not so arbitrary or capricious as to constitute an abuse of discretion. Administrative Procedure Act, Section 10 (e) (5 U.S.C.A. § 1009(e) ); Universal Camera Corp. v. N. L. R. B., 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1950); State of North Carolina v. United States, D.C., 210 F.Supp. 675 (1962). If the court is affirmatively satisfied that the Commission's order does not depart from these standards, then the court must sustain the order, notwithstanding that we might have adopted a different point of view upon the same facts and law. United States v. Pierce Auto Freight Lines, Inc., 327 U.S. 515, 66 S.Ct. 687, 90 L.Ed. 821 (1946).

Youngblood seeks, by this application, a grant of territorial authority covering a part of Georgia and a part of South Carolina that will enable it to directly traverse that territory and will, at the same time, permit it to utilize that part of South Carolina involved (fifteen northwestern counties) as a gateway between North Georgia and authorized points in North Carolina, eliminating the Henderson County, North Carolina, gateway.

Exhibits tendered by Youngblood at the Joint Board hearing indicate that it conducted the following operating activity between North Georgia and South Carolina *via* the gateway in North Carolina during the period from January 1, 1958, through June 30, 1960:

| | TOTAL WEIGHT OF FREIGHT MOVED | TOTAL NUMBER OF SHIPMENTS MOVED |
|---|---|---|
| South Carolina to Georgia | 8,750,244 lbs. | 18,814 |
| Georgia to South Carolina | 4,844,253 lbs. | 4,883 |

During the same period of time, Youngblood handled freight traffic between North Georgia and North Carolina as is indicated by the following chart.

(Note: "S" refers to points in the four North Carolina counties of Buncombe, Graham, Haywood, and Henderson, the North Carolina points authorized in the

2. New Dixie Lines, Inc.; Overnite Transportation Co.; Akers Motor Lines, Inc.; Huckabee Transport Corp.; Southeastern Freight Lines.

grant of authority numbered I; "NS" refers to other points in North Carolina covered by other certificates of authority.)

| North Carolina *to* Georgia | Total Weight | Total Number Shipments |
|---|---|---|
| "NS" | 42,180,290 | 17,064 |
| "S" | 13,774,030 | 7,707 |
| | | |
| Georgia *to* North Carolina | | |
| "NS" | 42,855,247 | 19,445 |
| "S" | 19,932,253 | 7,713 |

Relative to shipments between North Georgia and South Carolina through the gateway, shipments were transported from or to all of the fifteen northwestern South Carolina counties involved in Youngblood's application. As to movements *from* the fifteen-county area to North Georgia, the largest volume was shipped from Greer and substantial volumes were shipped from such points as Carlisle, Catawba, Clinton, Flint Hill, Gaffney, Grace, Greenville, Landrum, Laurens, Lyman, Mohawk, Pickens, Rock Hill, Spartanburg, Startex, Taylors, Union, Whitney, and Winnsboro. Traffic *from* North Georgia to South Carolina points originated in Atlanta, Chamblee, Dahlonega, Decatur, East Point, Gainesville, and Rabun Gap with the greatest volume moving from Atlanta, Chamblee, and East Point.

Movements *from* North Carolina "NS" involved 73 points of origin, with the greatest volume moving from Charlotte, High Point, Pisgah Forest, and Spindale and substantial volume moving from Gastonia, Hickory, Marion, Old Fort, and Statesville. From North Carolina "S" to North Georgia, shipments originated at 20 points, with the greatest volume moving from Asheville, Biltmore, Canton, Fletcher, Hendersonville, and Robbinsville. Movements *from* North Georgia *to all* North Carolina points ("NS" and "S") originated in Atlanta, Chamblee, Dahlonega, Decatur, East Point, Rabun Gap, Scottsdale, and Gainesville. Note that with the exception of Scottsdale the

North Georgia origin points of shipments to North Carolina are the same as those of shipments to the fifteen-county South Carolina area.

Protesting carriers operate as follows:

(1) New Dixie Lines, Inc.: As pertinent to Youngblood's application, New Dixie has authority to transport general commodities over irregular routes between Atlanta, Georgia, and points within fifteen miles thereof, on the one hand, and, on the other, points in North and South Carolina. It moves an average of two truckloads a day in each direction between the Atlanta area and Greenville and Spartanburg, South Carolina. It has extensive service in the South Carolina areas of Greenville, Anderson, and Laurens, and toward Columbia operating peddle runs out of Greenville. It has experienced no competition from Youngblood in service between Atlanta and the northwestern sector of South Carolina.

(2) Overnite Transportation Company: Relative to this proceeding, Overnite has authority to transport general commodities between High Point, North Carolina, and Atlanta, Georgia, serving all intermediate points, over regular routes from High Point to Charlotte, North Carolina, thence over these regular routes to Atlanta: (a) from Charlotte over U. S. Highway 29 to Greenville, South Carolina, thence over U. S. Highway 123 to Cordelia, Georgia, thence over U. S. Highway 23 to Atlanta; (b) from Charlotte to Greenville, South Carolina, thence over U. S. Highway 29 to Athens,

Georgia, thence to Atlanta; (c) from Charlotte to Columbia, South Carolina, thence to Augusta, Georgia, thence to Atlanta. Additionally, it operates over irregular routes between points on the regular routes running between High Point and Atlanta, on the one hand, and, on the other, points in South Carolina and in North Carolina on and west of U. S. Highway 301. It has similar authority in eastern North Carolina, parts of Georgia and all of South Carolina. Hence, to the extent that Overnite does not serve Georgia and South Carolina under its regular route authority, it does so under irregular route authority or by utilizing gateways in certain of its contigous grants of authority.

Overnite is opposing Youngblood's application insofar as it affects traffic between Georgia and South Carolina; it does not consider Youngblood currently competitive to a very great extent. The basis for Overnite's opposition to Youngblood's application for authority to operate directly between North Georgia and the fifteen-county South Carolina area is clearly illustrated by a comparison of their respective mileages between designated South Carolina and Georgia points under their existing respective authorities, with Youngblood moving through its gateway in North Carolina. The following chart is representative of some of the mileage differences. "O" represents Overnite; "Y" represents Youngblood.

### HIGHWAY MILES BETWEEN

| SOUTH CAROLINA | And | | | GEORGIA | | |
| --- | --- | --- | --- | --- | --- | --- |
| | Athens | | Atlanta | | Gainesville | |
| | "O" | "Y" | "O" | "Y" | "O" | "Y" |
| Gaffney | 143 | 299 | 212 | 228 | 149 | 205 |
| Greenville | 93 | 175 | 162 | 204 | 99 | 181 |
| Laurens | 105 | 210 | 177 | 239 | 136 | 216 |
| Pickens | 82 | 198 | 151 | 227 | 88 | 204 |
| Rock Hill | 178 | 249 | 250 | 318 | 199 | 255 |
| Spartanburg | 123 | 179 | 192 | 208 | 129 | 185 |
| Union | 151 | 207 | 210 | 236 | 157 | 213 |

(3) Akers Motor Lines, Inc.: Akers conducts operations in North Carolina, South Carolina, and Georgia, as well as in other states. Pertinent here, it moves between Greensboro, North Carolina, and Thomasville, Georgia, *via* Charlotte, North Carolina, and Spartanburg and Greenville, South Carolina, serving all intermediate points; between Charlotte, North Carolina, and Albany, Georgia, (*via* routes in South Carolina) serving all intermediate points between; between Whitmire, South Carolina, and Athens, Georgia, Seneca, South Carolina, and Monroe, Georgia, serving all intermediate points. Akers moves freight between numerous other points in North Carolina, South Carolina, and Georgia within the territory covered by Youngblood's application. Indicative of Akers' activity in the area involved are these movements during the month of August, 1960: 2,406 shipments totalling 1,817,135 pounds from Atlanta, Georgia, to six points in North Carolina; 1,242 shipments totalling 1,503,888 pounds from Atlanta, Georgia, to three points in South Carolina; 587 shipments weighing a total of 648,087 pounds from Spartanburg, Greenville, and Rock Hill, South Carolina, to Atlanta and Athens, Georgia. Akers has not encountered any competition from Youngblood in the areas here under consideration.

(4) Huckabee Transport Corporation: Huckabee, too, operates in the three

states of North Carolina, South Carolina, and Georgia. It has authority to move between points in Georgia, on the one hand, and, on the other, points in South Carolina; between Charlotte, North Carolina, on the one hand, and, on the other, points in that part of South Carolina within 150 miles of Charlotte and west of a line extending from the North Carolina—South Carolina border, and bounded by designated highways, to York, Chester, Columbia, and Ulmers, South Carolina. It considers Youngblood to be currently a competitor to a limited extent, and is apprehensive that if Youngblood's application is granted it will pose a serious competitive threat.

(5) Southeastern Freight Lines: This carrier transports general commodities between points in South Carolina, on the one hand, and, on the other, points in Georgia. It maintains terminals at Columbia and Greenville, South Carolina, and at Atlanta, Georgia. It moves large-volume shipments on a direct service basis; it moves three to four truckloads a night from Atlanta to Greenville. Southeastern is of the opinion that if Youngblood's application is granted, Youngblood will be a serious threat and a new competition and will definitely affect service between the Atlanta and Greenville areas.

### ACTION OF INTERSTATE COMMERCE COMMISSION

(A) The Joint Board: The Joint Board hearing was conducted October 24, 1960, and its decision and recommended order handed down December 29, 1960. The Board applied the following standards: "In order for applicant to obtain the requested authority to eliminate the North Carolina gateway or gateways and to provide alternate gateways or direct service, in the absence of testimony of public witnesses (Youngblood's only witness was its President—General Manager), it must show affirmatively (1) that it is actually transporting a substantial volume of traffic from and to the points involved by operating in good faith through the gateway point or points, and in so operating, is effectively and effici-

ently competing with existing carriers and (2) that the elimination of the gateway or gateways would not enable applicant to institute a new service or service so different from that presently provided as to improve materially its competitive position to the detriment of existing carriers. In the former instance, a grant of the authority sought is justified solely upon proof that the proposed operation would result in operating economics which, although primarily a benefit to the applicant, indirectly benefit the public through the medium of more efficient and economical service. In the latter instance, however, where the elimination of the gateway requirement would allow a new service, or would provide applicant with a substantial competitive advantage not previously enjoyed, it is incumbent upon applicant to prove public convenience and necessity the same as in any other application for new authority."

The Joint Board found that Youngblood met the first test in that it was actually transporting a substantial volume of traffic from and to the areas involved and was effectively and efficiently competing with other carriers in the area. As to the second test, however, the Joint Board concluded "that the elimination of the gateways in Henderson County, North Carolina, and a grant of the authority sought would enable applicant to institute a new service or a service so different from that presently provided as to improve materially applicant's competitive position to the detriment of existing carriers. Inasmuch as no shipper evidence was presented in support of the application, and the evidence of record, based solely on operating economy and efficiency, does not warrant a grant of authority, the application should be denied." The latter conclusion, that the effect of the authorities sought would enable applicant to institute a "new service" was based upon the Board's finding that were the authority granted Youngblood would derive such a great savings in mileage and would acquire direct line service access to such a wide territory that its competitive situation relative to

other carriers in the area would be drastically altered.

Upon Youngblood's taking exception to the recommended order, the matter was heard by Division I of the Interstate Commerce Commission. Two competing motor carriers, Akers and Overnite, replied to Youngblood's exceptions.

(B) Interstate Commerce Commission —Division I: In its report and order, dated June 30, 1961, the Commission cited the same two tests as comprising the controlling standards. The Commission, however, cited another criterion applicable to test No. 1 (i. e., whether applicant is transporting a substantial volume of traffic from and to the points involved and is effectively and efficiently competing with existing carriers). The Commission noted that as to this test, the entire Interstate Commerce Commission had pointed out in The Maryland Transportation Company Extension—Specified Commodities, 83 M.C.C. 451 (Sept. 19, 1960), "that in order to justify elimination of a gateway, an applicant must show that he is an effective competitor as to substantially *all* points in his pertinent authorized territory, and that it is not enough for an applicant that it has handled even a substantial volume of traffic if it has provided service only at selective points." It was observed by the Joint Board that Youngblood's freight movements from Georgia to points in North and South Carolina respectively were from but eight named points in Georgia.[3] The Commission noted that all but three of the Georgia points at which shipments originated were within the Atlanta commercial zone, and that these remaining three points were almost on a direct line between Atlanta, Georgia, and Henderson County, North Carolina, at which latter point Youngblood's gateway is located. Upon that basis, the Commission specifically found "that applicant has failed to show that it is competing effectively throughout the portion of Georgia which it is authorized to serve."

Hence, the Commission applied not only the two general standards or tests that were applied by the Joint Board, but it also interjected into the first test a more specific criterion that had been developed by the I.C.C.; and upon application of that specific criterion found that Youngblood failed to measure up to its requirements.

As to the second test, the Commission agreed with the Joint Board that a grant of the authority sought by Youngblood's application would enable Youngblood to institute a wholly new service between many portions of Georgia and South Carolina, and found that Youngblood had failed to establish that the present and future public convenience and necessity required the proposed operation.

After Division I of the Interstate Commerce Commission had denied Youngblood's application, it petitioned the full Interstate Commerce Commission for reconsideration. The petition was denied. Youngblood then instituted this action to be heard before a three-judge court.

## CONTENTIONS AND ISSUES BEFORE THE COURT

Youngblood contends that the Commission erred in (1) requiring a showing that Youngblood was competing effectively throughout the entire North Georgia territory which it was authorized to serve, and (2) looking only to an entire elimination of gateways rather than collaterally considering a partial elimination of gateways, the result of which, it is asserted, would not be an operational improvement of such a nature as to affect the competitive situation to the extent that Youngblood could be said to be instituting a "new service" requiring a showing of public convenience and necessity other than increased economics. Youngblood styles this the "all or nothing at all standard" and contends that it is improper in this instance. It is Youngblood's position that the standard so employed by the Commission effectively pre-

3. Atlanta, Decatur, Chamblee, Scottsdale, East Point, Dahlonega, Rabun Gap, Gainesville.

cluded it from considering the feasibility or propriety of a partial grant of the authority sought, is novel to a gateway elimination application, and is arbitrary and carpricious. Youngblood states in its brief that it proposed, as an alternative to the grant of all the authority sought by the application, either a grant restricted against service between points in the adjacent South Carolina-Georgia counties or one limited to service to and from the four North Georgia points at which the Commission acknowledged that Youngblood handled substantial traffic.[4] In its brief, the United States of America notes that this proposal was not made until Youngblood petitioned the full Commission for reconsideration, which petition was denied.

The gist of the Government's position is that all standards employed by the Commission were entirely proper and reasonable, and that the record discloses that were even a partial grant made of the authorities sought by Youngblood, the result would still be a "new service" requiring a showing by shipper witnesses of public necessity and convenience.

## DECISION OF THE COURT

Youngblood's application for a certificate of public convenience and necessity as a motor common carrier of general commodities requested an extension of its existing operating authority by eliminating certain gateway requirements. It is provided in 49 U.S.C.A. § 307 that "a certificate shall be issued to any qualified applicant therefor, authorizing the whole or any part of the operations covered by the application, if it is found that the applicant is fit, willing, and able properly to perform the service proposed * * * and that the proposed service, to the extent to be authorized by the certificate, is or will be required by the present or future public convenience and necessity; otherwise such application shall be denied * * *."

No question was raised in these proceedings as to Youngblood's fitness, willingness, or ability to perform the services sought in its application. The sole matter to be resolved by the Commission was whether the public convenience and necessity warranted the issuance of the certificate.

■ Congress has never attempted to define "public convenience and necessity." Its interpretation has been left to the administrative and judicial bodies. The Interstate Commerce Commission has long assumed it to be its duty to make findings of facts and apply thereto its judgment in determining public convenience and necessity within the framework of the Interstate Commerce Act. That assumption of duty and commensurate authority early received the sanction and approval of the federal courts. See: Interstate Commerce Commission v. Parker, 326 U.S. 60, 65 S.Ct. 1490, 89 L.Ed. 2051 (1945). The issue of "public convenience and necessity" is peculiarly within the Commission's discretionary exercise of its expert judgment in the field of transportation. United States v. Carolina Freight Carriers Corp., 315 U. S. 475, 62 S.Ct. 722, 86 L.Ed. 971 (1942). No party in the instant proceeding controverts the Commission's duty and authority to establish standards and tests to facilitate its determination of the existence of public convenience and necessity or the lack thereof.

Youngblood does seriously question, however, the propriety and validity of a criterion employed by the Commission supplementary to the tests utilized by the Joint Board: Is Youngblood effectively competing as to substantially *all* the points in its pertinent authorized territory? Division I then decided, contrary to the finding of the Joint Board, that Youngblood was *not* effectively competing with other carriers by moving a substantial volume of freight to and from the points involved by operating through its gateway, for the reason that it had failed to provide service throughout the North Georgia territory, but had served

---

4. The Atlanta commercial zone (Atlanta, Decatur, Chamblee, Scottsdale, East Point), Dahlonega, Gainesville, and Rabun Gap.

**818**

only eight communities, five of which constitute the Atlanta commercial zone[5] and the other three[6] being located on an almost direct line between Atlanta and Youngblood's North Carolina gateway.

■ Youngblood complains that the Commission's requirement that it show effective competition with other motor carriers in substantially *all* its authorized territory (particularly North Georgia) in order to meet the first test for the elimination of a gateway is novel to an application of this sort, is arbitrary and carpricious, and precludes the Commission from considering a partial elimination of gateways. We disagree with Youngblood's contention.

■ The Interstate Commerce Commission, in the exercise of its administrative authority and discretionary judgment, not only can promulgate standards for determining public convenience and necessity, but is free to alter its policies and standards when the necessity, in its judgment, arises. See: Securities and Exchange Commission v. Chenery Corp., 318 U.S. 80, 63 S.Ct. 454, 87 L.Ed. 626 (1942). No problem with respect to due process arises, for Youngblood does not contend that it could have offered evidence showing effective competition in *all* its authorized territory if it had but realized the necessity. See: E. Brooke Matlack, Inc. v. U. S., D.C., 119 F.Supp. 617 (1954).

The alleged "new" requirement is not even new. On December 18, 1952, the Commission (Div. 5) decided Childress—Elimination of Sanford Gateway, 61 M.C. C. 421, and published the decision in an official publication. In that gateway elimination proceeding, the Commission had this to say in its decision and order:

> Applicant's service to the smaller points in the Sanford area averaged one to two shipments a month and * * * consisted of truckloads of only a few diversified commodities. Considering *the relative infrequency*

*of the service* and the small degree of diversification of the commodities handled by applicant to points in the Sanford area, we conclude that he has *not* been an effective competitor of existing direct-line carriers in the transportation of general commodities *to points in this area.* (Emphasis added by the court.)

Hence, as early as 1952 the criterion here complained of was inserted into the two more general tests by the Commission. It is clear from the above quotation that one of the matters considered by the Commission and upon which its ultimate determination of public convenience and necessity turned was whether Childress was effectively competing in the smaller points in one specific area of its territory as well as in the larger and more important points. As applied in Childress, the test is really more stringent than here; for, in Childress, *some* service was being rendered in the less significant points in the area, whereas it appears that Youngblood was rendering *no* service in its North Georgia territory except at selected points. This more specific element of the Commission's standards was reiterated, perhaps more clearly, in the full Commission's decision and order in The Maryland Transportation Company Extension—Specified Commodities, 83 M.C.C. 451 (Sept. 19, 1960). If the requirement was not so clearly and effectively stated in Childress as to be definite and certain, the Commission certainly made it clear in Maryland (which decision was handed down *after* Youngblood filed its application but *before* its hearing before the Joint Board) wherein it stated:

> (I)t is not enough to show that between selected points applicant has transported substantial traffic, or that throughout its territory applicant has transported commodities which are insufficient adequately to represent its pertinent commodity description. Rather, *it must be shown that the proposing carrier is*

---

5. See footnote 4, supra.

6. Dahlonega, Rabun Gap, Gainesville.

*an effective competitor* as to substantially all of the commodities and *between substantially all of the points within the scope of its pertinent outstanding authority.* (Emphasis added by the court.)

Youngblood next objects that the actions by the Commission in this proceeding were arbitrary and capricious in that the standards upon which the ultimate findings and conclusions are based arbitrarily preclude partial elimination of gateways, discriminate against irregular-route carriers, prevent Youngblood from realizing economies and safety in its operations, and, in effect, are not supported by substantial evidence.

 Not until Youngblood petitioned the full Commission for reconsideration did it even propose that it be granted a partial elimination of gateways. It filed no exception to the Joint Board's report and recommended order claiming failure to consider a partial elimination, nor did it suggest to Division I of the Commission that it desired such consideration. According to the Government's representation to the court, it is the Commission's practice to refuse to reconsider matters to which there has been no objection made before the initial hearing officer. The adoption of such a practice or rule of procedure is within the power of the Commission, and we find it to be reasonable on its face. See: Administrative Procedure Act, particularly Section 8 (5 U.S.C.A. § 1007). It conclusively appears, then, that the proposition of partial elimination of gateways was never properly or timely presented to the Commission and it did not, therefore, unreasonably fail to consider it. Even assuming, however, that such a request was before the Commission, there is ample evidence in the record before us to support a denial. Were even a partial elimination of the North Carolina gateway granted, it is not unreasonable to conclude that the result would be such a reduction of route circuity and mileage savings for Youngblood as to place it in the position of having achieved "new service" capabilities.

If given the authority sought by its application, Youngblood would be able to compete directly with New Dixie Lines, Inc., for the Atlanta to Greenville and Spartanburg freight as well as for other service in northwestern South Carolina; its competitive position with Overnite Transportation Company with respect to North Georgia to South Carolina and the reverse would be altered by the elimination of their current mileage differences between points involved, which range from 16 to 153 miles; its competitive position with Akers Motor Lines, Inc., would be likewise changed; it could become additionally competitive with Huckabee Transport Corporation; it would be a new competitive threat to Southeastern Freight Lines with respect to traffic between Greenville, South Carolina, and Atlanta, Georgia. Its circuity of operations would be reduced by 15 to 71 percent.

Finally, Youngblood asserts that the standard employed in arriving at a conclusion as to its application is discriminatory against irregular-route carriers for the reason that the same standard is not applied to applications from regular-route carriers. But the same general two-part test is utilized by the Commission in both instances. See, e. g.: Chicago Express, Inc., Extension—Tuscola, Ill., 79 M.C.C. 384 (1959).

That Division I of the Commission did not reiterate the facts stated by the Joint Board relative to the "new service" test is of no consequence, for the Commission expressly adopted the Board's statement and finding of the facts as its own and also adequately stated its conclusions as to this point and its basis therefor.

 We conclude, upon consideration of the record as a whole, that the Commission's findings of fact are supported by substantial evidence; that its conclusions of law are free of error, and that the denial of Youngblood's application was neither arbitrary nor capricious.

Counsel may submit an appropriate judgment in accordance with this opinion.