**The EASTERN CENTRAL MOTOR CAR-RIERS ASSOCIATION, Inc., et al., Plaintiffs,**

v.

**The UNITED STATES of America and The Interstate Commerce Commission, Defendants.**

**Civ. A. No. 1234–64.**

United States District Court District of Columbia.

March 26, 1965.

Guy Postell, Atlanta, Ga., Bryce Rea, Jr., and Donald E. Cross, Rea, Cross & Knebel, Washington, D. C., Homer S. Carpenter and John S. Fessenden, Rice, Carpenter & Carraway, Washington, D. C., for plaintiffs.

William H. Orrick, Jr., Asst. Atty. Gen., John H. D. Wigger, Dept. of Justice, David C. Acheson, U. S. Atty., Washington, D. C., for the United States.

Robert W. Ginnane, Gen. Counsel, I. K. Hay, Deputy Gen. Counsel, Betty Jo Christian, I. C. C., Washington, D. C., for Interstate Commerce Commission.

Paul F. McArdle, Covington & Burling, Washington, D. C., Carl Helmetag, Jr., Philadelphia, Pa., for intervenors.

Before FAHY, Circuit Judge, and PINE and McGARRAGHY, District Judges.

PER CURIAM.

This is an action brought by plaintiff motor carrier associations pursuant to 28 U.S.C. §§ 1336, 1398, 2284 and 2321–2325 (1958) and Section 10 of the Administrative Procedure Act, 5 U.S.C.A. § 1009 (1958), to set aside and annul the report and orders of the Interstate Commerce Commission entered in Investigation and Suspension Docket No. M–17133, Drugs and Related Articles, New Jersey to

Chicago (August 8, 1963), 322 I.C.C. 734 (1963) in which the Commission found proposed motor carrier rates to be just and reasonable under the principles adopted in Iron or Steel Scrap—Conn., Mass. & R. I. to Pa., 318 I.C.C. 567 (1962).

Plaintiffs have exhausted their administrative remedies and the assailed decision is administratively final in accordance with the Commissions' General Rules of Practice [1] and the procedure prescribed by the Interstate Commerce Act.[2] By Court order of June 3, 1964, upon consent of all parties, numerous railroad companies were joined as intervening plaintiffs.

■ In reviewing an order of the Interstate Commerce Commission, as with any administrative agency order, the court is limited in scope by settled principles of administrative law, both general [3] and statutory.[4] An exploration of these limitations is appropriate at the outset.

■ The Commission is presumed to have properly performed its official duties; and this presumption supports its actions in absence of clear evidence to the contrary.[5] This presumption stems from the deference due the Commission because of its familiarity with the conditions in the industry which it regulates.[6] "The Supreme Court has kept the boundary-line dividing judicial and I. C. C. functions a stark one, even when re-versing a Commission judgment. For 'it is the Commission, not the courts, that brings an *expertise* to bear on the problem, that makes the findings, and that grants or denies the applications' ".[7] However, judicial deference to expertise is not boundless; and expertise is not sufficient in itself to sustain a decision. The order must be supported by substantial evidence [8] and must be made within the statutory limits placed on the Commission's powers by Congress.[9]

■ With the Commission's expertise in mind, it is our duty to review the record and the conclusions reached, as required by the provisions of the Administrative Procedure Act. Under Section 10 of the Administrative Procedure Act, as applicable here, an order of the Interstate Commerce Commission may be invalidated if it is either "(1) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law * * * (3) in excess of statutory jurisdiction, authority, or limitations, or short of statutory rights * * * (5) unsupported by substantial evidence * * *".[10]

■■ "Arbitrary" and "capricious" are to be understood in their legal sense as distinguished from their opprobrious or popular meaning. Accordingly these words mean "without rational basis".[11] So, if a rational basis for the order is found, then, so far as arbitrariness or

1. See 49 C.F.R. 1.101 (rev. 1963).

2. 49 U.S.C. § 17 (1958).

3. See Roadway Express, Inc. v. United States, 213 F.Supp. 868, 873 nn. 18 & 19 (D.C.Del.1963), aff'd, 375 U.S. 12, 84 S. Ct. 53, 11 L.Ed.2d 38 (1963).

4. 5 U.S.C.A. § 1009 (1958).

5. Accelerated Transport-Pony Express, Inc. v. United States, 227 F.Supp. 815 (D.C.Vt.1964), aff'd, 379 U.S. 4, 85 S.Ct. 43, 13 L.Ed.2d 21 (1964).

6. See East Texas Motor Freight Lines v. Frozen Food Exp., 351 U.S. 49, 54, 76 S. Ct. 574, 100 L.Ed. 917 (1956).

7. Roadway Express, Inc. v. United States, supra n. 3, 213 F.Supp. at 873.

8. I. C. C. v. J-T Transport Co., 368 U.S. 81, 93, 82 S.Ct. 204, 7 L.Ed.2d 147 (1961).

9. See East Texas Motor Freight Lines v. Frozen Food Exp., supra n. 6.

10. Mitchell Bros. Truck Lines v. United States, 225 F.Supp. 755 (D.C.Or.1963), aff'd, 378 U.S. 125, 84 S.Ct. 1657, 12 L. Ed.2d 744 (1964); accord, Youngblood Truck Lines, Inc. v. United States, 221 F. Supp. 809 (W.D.N.C.1963); See Stott v. United States, 166 F.Supp. 851 (S.D.N.Y. 1958).

11. Dell Publishing Co. v. Summerfield, 198 F.Supp. 843, 844 (D.D.C.1961), aff'd, 113 U.S.App.D.C. 1, 303 F.2d 766 (1962).

capriciousness is concerned, the court will have exhausted its judicial function.[12]

To merit judicial approbation, the Commission's order also must be within the statutory limits and authority expressed by Congress. The National Transportation Policy, 49 U.S.C. preceding §§ 1, 301, 901, and 1001 (1958), "is the yardstick by which the correctness of the Commission's actions will be measured".[13]

"It is hereby declared to be the national transportation policy of the Congress to provide for fair and impartial regulation of all modes of transportation subject to the provisions of this Act, so administered as to recognize and preserve the inherent advantages of each; to promote safe, adequate, economical, and efficient service and foster sound economic conditions in transportation and among the several carriers; to encourage the establishment and maintenance of reasonable charges for transportation services, *without unjust discriminations, undue preferences or advantages, or unfair or destructive competitive practices;* to cooperate with the several States and the duly authorized officials thereof; and to encourage fair wages and equitable working conditions;—all to the end of developing, coordinating, and preserving a national transportation system by water, highway, and rail, as well as other means, adequate to meet the needs of the commerce of the United States, of the Postal Service, and of the national defense. All of the provisions of this Act shall be administered and enforced with a view to carrying out the above declaration of policy." (Italics supplied)

As here relevant, Section 216(b) of the Interstate Commerce Act, 49 U.S.C. § 316(b) (1958), requires all motor common carriers "to establish, observe, and enforce just and reasonable rates * * * and just and reasonable regulations and practices relating thereto * * * and all other matters relating to or connected with the transportation of property in interstate or foreign commerce".

Section 216(d) requires all charges to be "just and reasonable" and prohibits and declares unlawful every "unjust and unreasonable charge". Section 216(g) places the burden of proof upon a carrier at any hearing involving a change of rate to show that the proposed changed rate or practice is "just and reasonable".

The court must satisfy itself that these policies have been followed. "Just as we would overstep our duty by undertaking to evaluate the evidence according to our own notions of the public interest, we would shirk our duty were we summarily to approve the Commission's evaluation of the record without determining that the agency's evaluation had been made in accordance with the mandate[s] of Congress".[14]

As to the sufficiency of evidence to support the order, it is not the proper function of the court to substitute its judgment or to weigh evidence in place of the Commission.[15] On the other hand, the court must review the record without a rubber stamp approach. As

---

12. Mississippi Valley Barge Line Co. v. United States, 292 U.S. 282, 286–287, 54 S.Ct. 692, 78 L.Ed. 1260 (1934); J. B. Acton, Inc. v. United States, 221 F.Supp. 174 (W.D.Mo.1963), aff'd, 376 U.S. 779, 84 S.Ct. 1133, 12 L.Ed.2d 83 (1963); see Capital Transit Co. v. United States, 97 F.Supp. 614 (D.D.C.1951).

13. Schaffer Transp. Co. v. United States, 355 U.S. 83, 88, 78 S.Ct. 173, 176, 2 L. Ed.2d 117 (1957); see Dixie Carriers, Inc. v. United States, 351 U.S. 56, 76 S. Ct. 578, 100 L.Ed. 934 (1956).

14. Schaffer Transp. Co. v. United States, supra n. 13.

15. Illinois Commerce Comm. v. United States, 292 U.S. 474, 484, 54 S.Ct. 783, 78 L.Ed. 1371 (1933); Boston and Maine R.R. v. United States, 153 F.Supp. 952 (D.C.Mass.1957); see Nashua Motor Exp., Inc. v. United States, 230 F.Supp. 646 (D.C.N.H.1964); J. B. Acton, Inc. v. United States, supra n. 12.

stated in Nashua Motor Exp., Inc. v. United States, supra note 15, 230 F.Supp. at 650:

"[T]his court is bound to inquire into every aspect of the proceedings below wherein it may appear that the Commission has otherwise applied an erroneous standard of law, or has made arbitrary findings, or has reached ultimate conclusions without adequate subordinate findings, or has failed in any other way to observe those procedures of investigation and elaboration which have become the hallmarks of proper administrative determination."

*Background and Facts*

Since the beginning of Federal Government regulation of the motor carrier industry, and even before, there have been two basic methods of operation for motor carrier transportation. One method has been for the carrier to assume full responsibility for all aspects of its service to the public—i. e., to own its vehicles and equipment, to maintain and service this equipment, and to hire its own employees —in general, a self-sustaining operation. The other method (called herein the "owner-operator" method) has been to purchase or hire "owner-operators" to perform a portion or all of its service to the public. These owner-operators are not carriers and are not directly regulated by the I. C. C. They own the furnished vehicles, provide the drivers, and assume responsibility for many of the operation details, such as the maintenance and servicing of vehicles. The compensation of the owner-operators is on the basis of a fixed sum or a percentage of the revenue of the carrier from the operations.

In regulating the motor carrier industry, the Commission frequently is required to determine whether the rates charged the public are "just and reasonable".[16] This question arises often in connection with a proposed rate reduction —as in the present case. In order to meet the criterion of justness and reasonableness, the Commission has consistently held that the rates must be "compensable"—i. e., that the revenues must defray operation expenses and yield a reasonable return.[17] This standard is not in dispute. Rather, the controversy in this litigation goes to the type of evidence required to prove that a rate is compensatory.

One of the methods [18] used to prove the compensativeness of rates, and the prevailing method, is to introduce evidence of total costs and to compare them with evidence of total revenue. This is the "costs method" with which we are concerned in this litigation. Self-sustaining carriers, owning and operating their equipment are required to furnish evidence of their own actual costs for comparison with their revenue. However, carriers using the owner-operator method present the problem out of which grows this litigation, and it is this: Should they be required to show their own costs *and* the *actual costs incurred* by the owner-operators for comparison with total revenue? Or should they be allowed to show only their own costs plus the lump sum paid to the owner-operators, without evidence of the actual costs incurred by the latter? Plaintiffs' member carriers, who operate on the self-sustaining basis contend that the Commission's decision permitting the lump sum method with respect to owner-operator carriers is unlawful and in violation of legislative policies.

16. See Sections 216(b), (d) and (g), supra.

17. See Chicago & E. I. R. R. v. United States, 107 F.Supp. 118 (D.C.1952), aff'd, 344 U.S. 917, 73 S.Ct. 346, 97 L.Ed. 707 (1953).

18. For other methods of proving justness and reasonableness of rates, see Aluminum Articles from Newport, Ark., to the East, 306 I.C.C. 607 (1959); Aluminum or Aluminum Articles from or to Newport, Ark., 306 I.C.C. 579 (1959); Wire and Tubes from New Jersey to Memphis, 305 I.C.C. 580 (1959); Cotton Piece Goods in the South, 304 I.C.C. 667 (1958).

To discern with exactness the role that this problem plays in the present litigation, the development of the Commission's position is relevant. In Class Rates and Ratings, Malone Freight Lines, Inc., 304 I.C.C. 395 (1958), the Commission approved the protestant's proposed rate reduction on the basis of a favorable comparison with other rates existing on similar commodities. The determination of actual costs of transportation services was found to be not essential to a finding that the rates are reasonably compensatory and just and reasonable. The Commission, by way of *dictum* at 398, made a comment which is apposite:

"In future cases in the interest of obtaining an adequate cost picture, particularly when main reliance is placed upon cost evidence, it would be helpful for Malone, and other similarly situated carriers, to show in more detail the actual costs incurred for the movement of the traffic involved. *Data for representative owner-operator movements should not be difficult of collection or submission, and certainly they would facilitate determination of the compensativeness question.*" (Emphasis added)

Three years later, in Floor Coverings and Related Articles from East to South, 313 I.C.C. 530, 535 (1961), this *dictum* was the ground for disapproving rates of that same carrier and became the costs method for establishing the compensatory character of rates in owner-operator operations. At 535:

"The cost data of record do not include the full actual cost for performing the entire service. Purchased-transportation agreements premised upon a percentage of revenue afford no sound basis for a determination of the compensativeness of rates. * * * In the absence, as here, of acceptable rate comparisons, the compensativeness of these rates requires a determination of the full costs of the service thereunder, *including representative costs of the owner-operators.*" (Emphasis added)

This requirement was judicially sustained in Malone Freight Lines, Inc. v. United States, 204 F.Supp. 745 (N.D.Ala. 1962).

After the Floor Coverings decision, Eastern Central Motor Carriers Association, a plaintiff in this litigation, protested proposed reduced rates of Long Transportation Company and brought about the proceedings in Drugs and Related Articles, New Jersey to Chicago, I. & S. Docket No. M–16160 (November 27, 1962) (hereinafter called the "first Drugs decision"). The Commission found that the proposed rates were not shown to be just and reasonable and required their cancellation on the ground that proponent failed to provide adequate cost data.

One week after the first Drugs decision, the Commission decided Iron or Steel Scrap—Conn., Mass. & R. I. to Pa., 318 I.C.C. 567 (1962) (four Commissioners dissenting). The proponents in this proceeding operated exclusively by means of owner-operators. Proponent submitted detailed evidence of costs to prove compensativeness—with the exception that no evidence was introduced respecting the actual operation costs incurred by its owner-operators, as required by the Floor Coverings decision, supra. The Commission, in spite of this lack of evidence which previously was required, found the rates compensatory and just and reasonable. In reversing the evidentiary principles of Floor Coverings, the Commission set up new criteria for proving rates compensable. The proponent carrier utilizing owner-operators "is required to prove: (1) that the revenue retained by the carrier fully covers the costs incurred by the carrier itself and yields a reasonable profit; and (2) that the revenue paid to the owner-operators is sufficient to acquire or retain the services of owner-operators for the movement of the traffic to which the rate is applica-

ble".[19] Conspicuously absent is the necessity to develop the costs of the basic transportation service which the owner-operator provides.

Subsequent to the Iron or Steel Scrap decision, Motor Carriers Tariff Bureau, Inc., a plaintiff in this suit, published reduced rates at the request of Long Transportation Company. These rates were the same rates required to be cancelled in the first Drugs case. Upon protest of Eastern Central, the Commission instituted a proceeding to inquire into their lawfulness. This time the Commission decided that the rates were compensatory and just and reasonable under the new criteria of the Iron or Steel Scrap case. Drugs and Related Articles, New Jersey to Chicago, I. & S. Docket No. M–17133 (August 8, 1963). This decision, as based on the Iron or Steel Scrap case, is attacked and is the subject of the present litigation.

*Analysis and Conclusion*

The question before the court is whether the Interstate Commerce Commission had a rational basis for determining that proof of actual costs incurred by owner-operators need not be shown to prove rates compensatory in carrier owner-operator operations.

The sole reason given by Commission for changing the requirements of evidence in Floor Coverings, was that "it is virtually impossible for carriers to collect and to submit reliable cost data for representative owner-operator movements".[20] The majority base this conclusion on the fact that "owner-operators are not subject to direct regulation by the Commission" and consequently they are not required to maintain accounts and records or to file annual reports. But this overlooks the complete power of the Commission to require the submission of these data by the certificated carriers who can exact this information from their subcontractors who are their alter-ego in the actual carriage of commodities.

At least two decisions prior to the Iron or Steel Scrap case expressed completely opposite opinions as to the impossibility of obtaining costs data from owner-operators. In the Malone decision, supra, (304 I.C.C. 395, 398), the Commission observed that owner-operator costs should *not* be difficult of *collection or submission.* In Meats and Packinghouse Products, Midwest to Coast, 309 I.C.C. 551 (1960), costs data of owner-operators, in the form of a questionnaire, obtained by a statistician hired by the carrier, was proffered to prove actual costs of the owner-operator. The Commission admitted the "reasonably reliable" evidence over objections even though it could be regarded no more than rough approximations due to the varying bookkeeping methods employed by the owner-operator.[21] Apparently to aid parties in collecting more dependable data, the Commission, after receiving the questionnaire, added at 562:

> "For the benefit of parties to future proceedings in which owner-operator costs might be concerned, the following remarks are offered: The various types of expense which an owner-operator encounters, to a considerable extent, parallel those experienced by a motor carrier performing its own service and keeping its accounts and operating statistics in the manner prescribed by this Commission. The cost formula known as Highway Form B could be used to develop the cost of the owner-operator as well as that of the billing carrier, and, for the purpose of cost

19. Brief for Defendant, p. 19; see Iron or Steel Scrap case, supra, at 575.

20. Iron or Steel Scrap, supra at 574. Accord, Meats and PHP, Central & West to Far Western States, 319 I.C.C. 667, 677 (1963) (citing Iron or Steel Scrap as controlling).

21. Similarly, *subsequent* to the Iron or Steel Scrap case, an affidavit of the owner-operator showing his earnings, expenses, and net income, even though at best a rough approximation, was admitted to show the carrier's ability to acquire and retain owner-operators. Iron or Steel Articles Between Mass. & Mid. Atl. States, 322 I.C.C. 133 (1964).

presentation, the cost of the former would supplant the expense of purchased transportation with driver reported by the carrier in its annual report. After allowance for the normal driver wages of the operator, the difference between the purchased transportation reported by the carrier and the expenses of the owner-operator would reflect the profit (or loss) to the owner of the equipment."

It is clear that this advice discloses no apprehension about the availability of the necessary owner-operator expenses. Neither does it hint at any problem in obtaining the evidence—rather, it even suggests the manner in which the information can be acquired.

 There is no question that the Commission has full power and authority over the carriers hiring owner-operators [22] and it seems inescapable that the Commission can require the carriers to obtain the necessary costs data.[23]

"In a rate proceeding where the carrier has the burden of marshalling sufficient relevant and competent evidence to justify the lawfulness of its rates and fails to do so, it must suffer the consequences of a defective record. The Commission itself should not be the one to erect false barriers and give an excuse for not obtaining or for withholding pertinent information. It is an incongruous argument to say, in effect, that costs, or any other testimony for that matter, adduced under oath and subject to cross-examination, though admissible in all other respects, cannot be considered as valid evidence unless it can be verified by data contained in annual reports on file with the Commission. Insofar as I am able to determine, we have never rejected as valueless data presented by or for a carrier, a shipper, or anyone else, solely on the ground that they were not subject to the reporting or accounting requirements of the Act." [24]

In this purchased-transportation service situation, the owner-operator performs the function of a carrier, and operates in accordance with the carrier's rights. Thus it is indirectly regulated by the Commission. In our opinion no rational basis is here disclosed that makes the collection or submission of costs for owner-operator movements an impossibility.

Assuming that the acquisition of owner-operator costs, while not impossible, is nevertheless difficult, the question then becomes whether the need for production of the evidence outweighs the burden placed on the carrier and owner-operator. In our opinion, in order to meet the standards of the National Transportation Policy and the requirements of the applicable statutes, the need does out-weigh the burden.

 The mere fact that the Iron or Steel Scrap case, and the second Drugs case depart from the rule of an earlier case, does not require the court to take corrective action.[25] Nor is the fact that other rulings have followed Iron or Steel Scrap [26] control our decision; [27] however, such rulings may be weighed in accordance with their thoroughness of consideration, validity of reasoning and consistency with earlier or later decisions.[28]

As stated earlier, carriers which are self-sustaining, in attempting to prove the compensativeness of their rates, must furnish costs data of their total revenue

22. Iron or Steel Scrap, supra, dissenting opinion at 478; see also Meats and PHP, supra n. 20, at 677.

23. See LTL COR Rates—Between East and Territories West, I. & S. Docket No. M–18455 (1964) (Order of July 2, 1964).

24. Iron or Steel Scrap, supra, dissenting opinion at 578.

25. See Yale Transport Corp. v. United States, D.C., 210 F.Supp. 862, aff'd, 373 U.S. 540, 83 S.Ct. 1537, 10 L.Ed.2d 687 (1963).

26. See Brief of Plaintiff, n. 20, for cases following Iron or Steel Scrap.

27. Federal Maritime Board v. Isbrandtsen Co., 356 U.S. 481, 499–500, 78 S.Ct. 851, 2 L.Ed.2d 926 (1958).

28. Ibid.

and total expenses—this was true *before and* is true *after* the Iron or Steel Scrap case. Carriers utilizing owner-operators before the controversial decision, had to furnish the same evidence to prove compensativeness. Now, after that decision, the carrier using owner-operators, has only to show (1) that its *retained* revenue substantially exceeds its own costs, and (2) that the amount paid to the owner-operators is sufficient to acquire and retain the services of owner-operators.

■ The second requirement is based on the assumption that an owner-operator will hire himself out to the carrier *only* if his earnings from his operations will exceed his costs or expenses. This is patently questionable. "[T]he owner-operator's bargaining power is governed by the demand for his service. With investments in his vehicle, no other employment in sight, and perhaps stranded away from home, he is not in a good position to hold out for revenue certain to return his costs, assuming that he knows what they are. This precarious condition of owner-operators has also been known to contribute to violations of the hours-of-service regulations, endangering safety on the public highways." [29] Other economic factors also could persuade the owner-operator to accept non-profitable employment, e. g., the need to keep his equipment in use, or pressure for future contracts. The Commission, in fact, has expressly recognized that some owner-operators are *not* profiting from their operations with carriers.[30] Thus a carrier can attract an owner-operator willing to be employed when the owner-operator's income will *not* defray his expenses. Obviously, this makes a rate non-compensatory and, therefore, unjust and unreasonable—contrary to Sections 216(b) and 216(d) of the Interstate Commerce Act.

The whole is the sum of all its parts. Let us equate the "whole" with the *total* revenue-expense comparison. Under the owner-operator situation, there are two parts of this whole, viz., that part dealing with the carrier's revenue and expense, and that part concerning the revenue and expenses of the owner-operator. This second part may vary so as to make the applicable rates non-compensative. This same varying part, under the Commission's decision in Iron or Steel Scrap, is not even examined.

There are no regulations, presently in force, governing the splitting of revenue between carriers and owner-operators. This means that by hiring an owner-operator who provides his part of the carrier operation at less than cost, the certificated carrier can indiscriminately lower rates while still realizing a profit and meeting the requirements of the Iron or Steel Scrap case.[31]

■ It is important to note that the costs evidence problem arises because of competition between the various carriers to obtain a greater share of the available traffic.[32] Carriers with self-sustaining operations are vying with carriers employing owner-operators. Each faction would like to keep its rates lower than the other while realizing a profit. The Commission must require that the rates be just and reasonable, i. e., they must be compensative; and that when costs data are proffered to prove compensativeness, the revenue must exceed the costs. For self-sustaining carriers this means that their total revenue is to be compared with their total costs. Under the criterion of the Iron or Steel Scrap case, applicable here, the same standard is not applied to carriers using owner-operators. They have only to prove that part of the revenue, the part they retain, exceeds their costs. The other costs are not examined. This part not examined, in the cases drawn to the attention of the court (including the second Drugs decision), comprises approximately 60–70 per cent of the cost of operation.

30. See Meats and PHP, supra, n. 20, at 677.

31. See specific example in Iron or Steel Scrap, dissenting opinion at 579.

32. Brief of Defendant, pp. 11–12; See Brief of Plaintiff, p. 5.

In this manner, the real carrier of the goods goes unregulated in a regulated industry and the purpose and design of the Interstate Commerce Act is circumvented. Unequal treatment is accorded on the one hand to the carriers who own and operate the equipment and who are required to submit refined and detailed costs data to assure compensativeness and, on the other hand, to the carriers who lease the equipment and crew and who submit a lump sum covering the cost of rental equipment and crew and add to that only administrative and overhead costs and profit. This, in our opinion, is unjust discrimination against the self-sustaining carrier, as prohibited by the National Transportation Policy.

In reaching our decision, we are not unmindful of the function that the Interstate Commerce Commission is to perform and the discretion that it has. "Expert discretion is the lifeblood of the administrative process, but 'unless we make the requirements for administrative action strict and demanding, *expertise,* the strength of modern government, can become a monster which rules with no practical limits on its discretion' ".[33]

In this case, the court is not questioning the selection of methods used to prove that rates are compensative. All that this court holds is that, in absence of sufficient reasons, when the costs method is used to prove the compensativeness of reduced motor carrier rates, that full production of evidence is required for both the self-sustaining carrier and the carrier using owner-operators, in order to meet the requirements of the National Transportation Policy and Sections 216(b), (d) and (g).

Accordingly, the order in Drugs and Related Articles—New Jersey to Chicago, I. & S. Docket No. M–17133 (August 8, 1963), is vacated, set aside, and remanded for action consistent with this opinion.

FAHY, Circuit Judge (dissenting).

In the language of plaintiffs and intervening plaintiffs their "contention is simple and unencumbered. It is that the Commission, without a stated rational basis, has established an evidential standard which is extremely discriminatory in fact and therefore unlawful." The evidential standard referred to is that in requiring costs data in the process of determining whether a rate is just and reasonable, that is, whether it is compensatory, the data required to be furnished by the Long Transportation Company is different in the respects pointed out in the court's opinion from that required to be furnished by plaintiffs. The difference, I think, does not amount to discrimination. It has a basis in the different methods of operation of Long and plaintiffs, also fully described in the court's opinion. This difference in the manner of carrying on the respective businesses of the carriers supplies a reasonable basis for a different requirement in the furnishing of cost data. Discrimination does not seem to me to be the problem.

However, we cannot affirm the Commission simply by finding no discrimination, without considering also whether the Iron or Steel Scrap rule respecting cost data, as applied in this case, enabled the Commission to find the proposed rates to be just and reasonable, that is, compensatory. It is not disputed that the rates are compensatory insofar as Long's own costs are concerned, including the amount paid to the owner operators engaged by Long. But it is contended that cost data supplied to the Commission are not shown to cover the costs of the owner operators. The Commission answers that their detailed cost data are not essential since the Commission reaches a decision that the rates are compensatory through data which shows that Long's retained revenues exceed its own costs and that the amounts paid the owner operators by Long are sufficient to acquire and retain

---

**33.** Burlington Truck Lines v. United States, 371 U.S. 156, 167, 83 S.Ct. 239, 245, 9 L.Ed.2d 207 (1962).

their services for the traffic to which the rates apply. This may not be the best way of solving the problem of compensativeness. Indeed it may prove to be inaccurate and inadequate in some instances; but on this record the Commission's conclusion that the rates were compensatory, based on use of the Iron or Steel Scrap criteria, has sufficient support, considered with the other evidence, to withstand judicial repudiation. There is evidence of contracts fixing the compensation for drivers' wages and vehicle hire of the owner operators, and Long is under obligation to assume responsibility for compliance by the owner operators with the safety and other Commission regulations. In the view of the Commission the initial burden of Long to establish that the challenged rates are just and reasonable was sustained and I find no sufficient basis for insisting otherwise.[1]

Regulations may be required to deal with carriers who operate primarily by using owner operators, in addition to or in amendment of regulations presently applicable. But rule-making proceedings are available for determining whether they are needed, and the nature of such regulations as may be needed. That problems do exist with respect to such operations, different from those of carriers who own all of the equipment used, I have no doubt. But I find no sufficient basis for holding in this case that the Commission's conclusion that the particular rates were just and reasonable should be set aside, or that the Commission should have found that they brought about destructive competition.

The opinion of the court sets forth a strong and persuasive position that the manner in which cost data is obtained from carriers similar to Long might at times not reflect the costs which should be reflected in determining the compensativeness of rates. This may well be; but my difficulty is that this does not undermine the compensativeness of the particular rates with which this case is concerned. This is not a rule-making proceeding designed to ascertain an appropriate general method to get at the question of compensativeness, with such latitude and exceptions in particular instances as such proceeding might indicate as desirable.

---

1. The reduced rates in question were published by Long to meet particular competition of a freight forwarder and a shipper association.