**UNITED STATES of America,**
**Plaintiff,**

**v.**

**WASHINGTON, VIRGINIA & MARY-LAND COACH COMPANY, Inc.,**
**Defendant,**

**and**

**D. C. Transit System, Inc., Washington Metropolitan Area Transit Commission, and Virginia State Corporation Commission, Intervenors-Defendant.**

**WASHINGTON, VIRGINIA & MARY-LAND COACH COMPANY, Inc.,**
**Plaintiff,**

**and**

**D. C. Transit System, Inc., Intervenor-Plaintiff,**

**v.**

**Stewart UDALL, Secretary of the Interior et al., Defendants.**

**Civ. A. Nos. 1172–63, 2874–63.**

United States District Court
District of Columbia.
April 13, 1967.

---

3. John Chipman Gray, The Nature and Sources of the Law (2nd ed. 1931) 189–97, 329–34.

Thomas L. McKevitt, Dept. of Justice, Henry J. Monahan, Asst. U. S. Atty., for United States of America and Stewart Udall, Secretary of the Interior.

Manuel J. Davis, Washington, D. C., for Washington, Virginia & Maryland Coach Co., Inc.

Wilmer S. Schantz, Jr., Washington, D. C., for D. C. Transit System, Inc.

Russell W. Cunningham, Arlington, Va., for Washington Metropolitan Area Transit Commission and Virginia State Corporation Commission.

## OPINION

SIRICA, District Judge.

This litigation involves a complex factual background and numerous legal issues; however, one issue stands out as paramount. That issue is whether the Secretary of the Interior through his delegate, the Director of the National Park Service, has discretionary power to limit suburban commuter bus traffic on part of the George Washington Memorial Parkway while not limiting such traffic on other parts of the Parkway. This litigation involves only those parts of the Parkway which are on the Virginia side of the Potomac River. Included in this issue is whether the Secretary has exercised his discretion in a reasonable and non-discriminatory manner under the circumstances and whether the Secretary has the authority to exact a fee from suburban commuter bus companies for such use of the Parkway as is permitted.

Annexed hereto as Appendix A is a map showing most of the Parkway. Included are the sections of the Parkway which are involved in this litigation, the site of the Central Intelligence Agency (C.I.A.), and all bridges, access roads and intersecting roads which shall be referred to in this opinion.

Also annexed hereto as Appendix B are detailed Findings of Fact and Conclusions of Law.

## PLEADINGS AND PARTIES

The first of these two consolidated actions was initiated by the United States, requesting injunctive relief against the Washington, Virginia & Maryland Coach Company, Inc. (W. V. & M.), restraining it from continuing its unauthorized oper-

ation of a suburban commuter bus service over the Parkway between the Key Bridge and the C.I.A. site, the newest section of the Parkway. The United States complained that W. V. & M. only has limited permission to use the Parkway—to carry passengers to and from the C.I.A.—and therefore it is violating Park Service Regulations by adding a wide network of commuter service to and from areas of northern Virginia beyond the C.I.A. Building and by routing this commuter traffic onto the Parkway. The government contends that W. V. & M.'s use of the Parkway is substantially more extensive under its unauthorized use than it would be if the Parkway were used only as authorized to serve the C.I.A. and direct return to Key Bridge. The government asserted that the regulations which grant to suburban commuter buses only limited access to the Parkway above Key Bridge are reasonable and necessary to preserve the scenic values of the Parkway.

In answer to this complaint, W. V. & M. denied the validity of the regulations upon which the United States requested this injunctive relief, claiming that the regulations are discriminatory in that they permit all buses except suburban commuter buses to use this portion of the Parkway in connection with services rendered off the Parkway, and by permitting all kinds of buses, including suburban commuter buses, to use the portion of the Parkway below the Arlington Memorial Bridge in connection with services rendered off the Parkway. The government's contention that suburban commuter buses detract from the Parkway's scenic values was answered by a denial that such buses have any noticeable effect upon prevailing aesthetic standards on the Parkway, and that even if there is such an effect it would still be unreasonable and discriminatory to insist on the preservation of scenic standards on the Parkway above the Key Bridge but not below the Arlington Memorial Bridge. W. V. & M. also counterclaimed for a return of fees paid under protest to the National Park Service of one cent per

vehicle mile. These fees, for prior use of the Parkway, amounted to $2,284.16 at the time of trial.

The D. C. Transit System, Inc., the parent corporation of W. V. & M., intervened as a defendant. Also intervening as defendants were the Washington Metropolitan Area Transit Commission (hereinafter referred to as the WMATC) and the State Corporation Commission of the Commonwealth of Virginia (hereinafter referred to as the Virginia State Commission). Although limited, the interventions of the two commissions was for the purpose of joining with the bus companies in emphasizing the legislative aspects of this litigation. The legislative element in this case concerns the issue of whether the act of September 15, 1960, (74 Stat. 1031) authorizing The Washington Metropolitan Area Transit Regulation Compact has any effect upon the powers and authority of the Secretary of the Interior or the National Park Service to regulate the kind and amount of suburban commuter bus traffic on the Parkway. The interests and contentions of the commissions and D. C. Transit are substantially identical with those of W. V. & M.

The second suit, brought by W. V. & M., raised substantially the same issues with three minor additions: first, W. V. & M. sought review of Park Service Regulations to the extent that they do not permit suburban commuter buses to travel on the Spout Run "neck" of the Parkway (a short deviation from the main Parkway route northwest of Key Bridge into Arlington proper), and between Key Bridge and Memorial Bridge (Route 50); second, W. V. & M. requested that the Secretary and the Park Service be enjoined from collecting fees for any use of the Parkway by commuter buses; and, third, D. C. Transit intervening as plaintiff sought review of Park Service Regulations to the extent that such regulations do not permit suburban commuter buses to use the northernmost part of the Parkway from the Beltway southward to the C.I.A., a stretch of about two miles. D. C. Transit presently carries suburban

commuters from Maryland, who work at the C.I.A., across the Potomac River via the Cabin John Bridge on the Beltway (Interstate Route 495). Because present regulations preclude D. C. Transit from using the two-mile "shortcut" on the Parkway from the Beltway to the C.I.A., a longer and more indirect route must be taken by continuing west on the Beltway past the entrance to the Parkway, on to Route 193, then doubling back on Route 193 to the other C.I.A. entrance.

The parties are slightly different in the second suit. Rather than the United States, the Secretary of the Interior and the Director of the National Park Service were named as defendants. The WMATC and the Virginia State Commission were named defendants in the second action although the positions taken by them are almost identical with those taken by the plaintiff bus companies. Whatever procedural advantages may have been obtained by naming the two commissions as defendants in the second suit, the Court will now treat both bus companies and both commissions as being aligned on the same side against the United States, the Secretary of the Interior, and the Director of the National Park Service.

### BACKGROUND AND FACTUAL SUMMARY

The Parkway is owned and controlled by the Federal Government. In Virginia it consists of an elongated national park running parallel to the bank of the Potomac River with a multi-lane highway as its most distinctive feature. From Mount Vernon, at its southern end, it stretches northwestward through Fairfax County, the City of Alexandria, Arlington County, and again, Fairfax County, Virginia. On its northwestern end it terminates at Interstate Route 495, the circumferential highway which forms a beltway around the major portions of the Washington metropolitan area.

For purposes of this litigation the Parkway has been referred to by various sections according to the sequence in which it was constructed. First, there is the southeastern part running from Mount Vernon through the City of Alexandria, past the National Airport, and terminating at the Arlington Memorial Bridge (Route 50). This part of the Parkway was once known as the "Mount Vernon Memorial Highway" and was completed in 1932. The Parkway above the Arlington Memorial Bridge was added section by section. In 1937, a short stretch was completed between Memorial Bridge and Key Bridge. In December 1950, the "Spout Run" section of the Parkway was completed. This section runs northwestward from Key Bridge but after less than one mile it deviates southwestward, away from the Potomac River and goes into Arlington proper.

The final stretch of the Parkway was completed in early 1960. It begins where the Spout Run portion deviates away from the Potomac, and continues northwestward along the Potomac Gorge, terminating at the Beltway.

The building which houses the Central Intelligence Agency was completed and opened in the fall of 1961. The C.I.A. site is adjacent to the Parkway, about two miles southeast of where the Parkway terminates at the circumferential highway. The C.I.A. site is served with an access road to and from the Parkway. The C.I.A. site is also served on its opposite side by State Routes 123 and 193, which join when they reach the C.I.A. site and continue toward Washington as Route 123. Going toward the District of Columbia and after passing the C.I.A. site, Route 123 goes over the Parkway at a clover-leaf intersection below the C.I.A. site and continues southeastward between the Parkway and the Potomac, connecting with Chain Bridge into the District of Columbia.

The National Park Service views the various sections of the Parkway differently with reference to what kind of commercial traffic will be permitted. Taxicabs are permitted to travel on any portion of the Parkway without payment of any fee. Commercial trucks are not permitted on any part of the Parkway except in special cases and consequently

there is no general provision for fees as to them.

With respect to commercial buses, however, use of the Parkway depends on two factors: what kind of service the buses render, and what portion of the Parkway is involved. First, as to the kind of service rendered, sightseeing buses, and airport buses serving Dulles and National Airports, are permitted on any portion of the Parkway which is desired and needed for those particular services subject to obtaining a permit and paying a fee There are also buses owned by the Federal Government which are used as a shuttle service between the C.I.A. and points in downtown Washington. These government-owned buses are permitted on the Parkway south of the C.I.A. without payment of a fee and in this respect are given more favored treatment than buses of W. V. & M. which are permitted the same use of the Parkway from Key Bridge to the C.I.A., but contingent upon payment of a fee of one cent per vehicle mile. Park Service Regulations prohibit W. V. & M. (or *any* suburban commuter bus company) from going beyond the C.I.A. to serve suburban residents in outlying northern Virginia, and, thus, these "C.I.A. commuter buses" operated by W. V. & M. are to be distinguished from "suburban commuter buses." In reality, therefore, any bus company (such as W. V. & M.) which operates on the Parkway to and from the C.I.A. under this special regulation, is merely operating a shuttle service for the benefit of the C.I.A. and its employees in competition with, and identical to, the government-owned shuttle service.

The second distinction made by Park Service Regulations deals only with "suburban commuter buses." Rather than depending on the kind of service which a bus renders, this distinction is based on different parts of the Parkway. For example, commuter buses which actually carry passengers between downtown Washington and points in residential areas of suburban Virginia ("suburban commuter buses") are allowed unlimited use of the Parkway only on the southern part between Memorial Bridge and Mount Vernon. Such buses, regardless of what company owns them, cannot operate above Memorial Bridge except for the limited "C.I.A. commuter service," without violating Park Service Regulations.

Simply stated, the regulations appear to discriminate against suburban commuter bus companies desiring to use the Parkway to serve the northern section of suburban Virginia. This is the basic complaint of the bus companies in this litigation. They want the restrictive regulations declared invalid, including the provisions which require the payment of a fee for such use of the Parkway as is now permitted or will in the future be permitted.

A few statistics will demonstrate the difference in treatment accorded suburban commuter bus companies desiring use of the Parkway above the Memorial Bridge when contrasted with the treatment accorded other bus companies rendering other kinds of passenger service over the same portion of the Parkway. Using the nine month period from January 1 to September 30, 1966, as an example, the evidence established that W. V. & M. operates an average of 52 one-way trips per day between Key Bridge and the C.I.A. This use of the Parkway includes service to outlying suburban Virginia in excess of the authority granted by Park Service permits and Regulations. Using the same period as an example, the evidence shows that Airport Transport, Inc. operates an average of about 98 one-way trips per day between Dulles Airport and a terminal in downtown Washington. These airport buses use the Parkway between Key Bridge and its intersection with Route 123 near the C.I.A. Occasionally, Airport Transport also carries passengers between Dulles and National Airports, in which event the Parkway is also used between Key Bridge and National Airport. On such occasions a limousine, rather than a bus, is generally used. The government-owned shuttle service between the C.I.A. and Key Bridge on the Parkway also involves about 99 one-way

trips per day, about 52 of which are by bus and the rest by limousine.

The most glaring example, however, of the discriminatory effect of the regulations can be illustrated by comparing the use of the Parkway above Key Bridge by W. V. & M. with the use of the Parkway below Arlington Memorial Bridge by A. B. & W. (Alexandria, Barcroft & Washington Transit Company), also a suburban commuter bus company. A. B. & W. is permitted to operate about 820 one-way trips per day on the Parkway below Arlington Memorial Bridge. It should be noted that not all of these trips cover the entire stretch between the Memorial Bridge and Mount Vernon. Many, if not most, of these trips enter or leave the Parkway between these two points; however, the fact remains that about 820 suburban commuter buses per day are permitted to travel at least some distance on the Parkway below the Memorial Bridge while carrying passengers to and from outlying suburban areas off the Parkway.

For a complete comparison between Parkway use by suburban commuter buses above Key Bridge with all other use of the Parkway by all other buses, something should be said about sightseeing buses. Between January 1 and October 31, 1966, the National Park Service issued 1224 one day permits (an average of about 4 per day) to the Gray Line in connection with its sightseeing tours A and D conducted over the Memorial Bridge—Mt. Vernon portion of the Parkway. In almost the same period (January 1st to October 19th) A. B. & W. was issued 610 sightseeing permits (an average of about 2 per day) for operations over the same portion of the Parkway. The White House Sightseeing Corporation also operates one or two daily sightseeing trips, and perhaps as many as 5 per day during the peak tourist periods, most of which are conducted over this southern portion. Finally, out-of-state carriers operating over the southern portion of the Parkway are granted an indeterminate number of sightseeing permits at Mt. Vernon by the National Park

Service for operations over the southern portions of the Parkway. The evidence adduced at trial indicates that very few, if any, sightseeing buses travel on the Parkway above Key Bridge.

Because an issue has been brought into this case of whether certain legislation enacted in 1960 may have modified or diminished the power of the Secretary of the Interior to regulate suburban commuter bus traffic on the Parkway, some facts as to this legislation should be stated. On September 15, 1960, the Congress of the United States gave its consent and approval (74 Stat. 1031) to a proposed interstate agreement ("Compact") between Virginia, Maryland and the District of Columbia. This Compact, finally ratified by the three signatories on December 22, 1960, established a commission, the WMATC, for the regulation of carriers of passengers between points in the metropolitan area of the District of Columbia. Under Article I of the Compact, the District of Columbia and suburban counties in Virginia and Maryland were included in a "Washington Metropolitan Area Transit District" over which the WMATC would have regulatory authority. In Virginia this District includes the City of Alexandria, the Counties of Arlington and Fairfax and that portion of Loudoun County occupied by Dulles Airport. In Maryland this District includes Montgomery and Prince Georges Counties. The District therefore includes all parts of the Parkway involved in this litigation.

The purpose of the enabling Act and Compact was the unification in one agency of all authority over commuter transit within this District which was previously vested in the several signatories and the Interstate Commerce Commission. The newly created Commission, the WMATC, was granted the power to issue certificates of public convenience and necessity, prescribe routes, set fares, and otherwise to govern commuter bus traffic in the metropolitan area.

Another important factor is that W. V. & M. and D. C. Transit have been granted certificates by the WMATC to

travel on the contested portions of the Parkway to serve suburban commuters. These certificates, however, contain a proviso that the bus companies must meet any criteria set by the Park Service. In other words, the WMATC, in prescribing a route over the Parkway, does not assume to have the power to overrule Park Service Regulations to the contrary; instead, the WMATC specifically states that it is for the bus company involved to comply with Park Service Regulations with respect to Parkway use.

This practice of the WMATC in adding a proviso to its certificates requiring the carrier to satisfy Park Service Regulations is no doubt based upon the specific language of Section 3 of the Act of Congress which authorized the Compact and the creation of the WMATC. Section 3 contains the following proviso:

> * * * *Provided further*, That nothing in this Act or in the compact shall affect the normal and ordinary police powers of the signatories and of the political subdivisions thereof and of the Director of the National Park Service with respect to the regulation of vehicles, control of traffic and use of streets, highways, and other vehicular facilities.

With respect to the fee requirement of one cent per vehicle mile for use of the Parkway by suburban commuter buses, I find that such fees are well within the limits set by other governmental authorities as to fees ("road taxes") required for use of city and state roads by commuter buses. Arlington County and the District of Columbia require fees of one cent per vehicle mile. These so-called "franchise fees" are also exacted on a mileage basis by the City of Fairfax, the City of Falls Church, and the City of Vienna, Virginia.

Returning now to the discrimination issue, certain facts should be stated about the government's position. The government argues that the presence of suburban commuter buses on the Parkway above Key Bridge is aesthetically objectionable, *per se,* and therefore the regulations designed to limit access to the

Parkway by such buses have a rational basis and are valid.

The government also points to an alternative route, via Route 123 and Chain Bridge, which W. V. & M. buses employed before the northern leg of the Parkway was completed and which is still available, although it is slower and a more circuitous route to and from downtown Washington. With respect to D. C. Transit's desire to use the two-mile shortcut to the C.I.A. at the northwest end of the Parkway, the government also points to the availability of the alternate route via the Beltway and Route 193 which D. C. Transit is presently using.

Finally, the government contends that a rational basis exists for the regulations which differentiate between the old and new sections of the Parkway (below Memorial Bridge and above Key Bridge, respectively). As to this contention the government argues that the old section below Memorial Bridge was originally a "Highway" and that only after it was authorized and construction begun was it designated as part of the George Washington Memorial "Parkway." The government further contends that when this section was constructed it partially took the place of a pre-existing commuter railway; that it was designed and constructed with bus stops; and that unlike the newer section above Key Bridge, it has many intersecting streets (without cloverleaf features) which are regulated by stop lights. In effect, the government is saying that although this old "highway" is now under the authority of the Park Service and is designated as part of a Federal Parkway, it is historically and realistically proper for the Secretary and the Park Service to consider it and govern it as a separate entity apart from the new section of the Parkway above Key Bridge.

Apart from the availability of alternate routes, the government has not established this theory from the evidence adduced at trial. First, from the evidence I cannot find that there is anything aesthetically objectionable, *per se,* about having commuter buses on the

Parkway above Key Bridge. The government has offered no valid reason which even attempts to justify a *per se* approach to this problem. In my view, a *per se* approach to solving a problem is only used when prior experiences with similar or identical problems is so convincing that evidence need not be introduced in a given instance to prove what has been proven many times in previous cases. The Court has found no such prior cases involving parkways and commuter buses and the parties have cited none.

▉ Second, and without taking a *per se* approach, I find that the government has not proved that suburban commuter buses have any adverse effect upon scenic aspects of the Parkway at the time of day when such buses would be using it.

In this case the government's only evidence that suburban commuter buses are spoilers of parkway scenic values is a self-serving letter to that effect from the Director of the National Park Service to the WMATC dated November 2, 1962 (Government Exhibit No. 23). The statements made in that letter are opinions rather than facts; there was no opportunity afforded counsel to cross-examine the Director of the Park Service on the contents of the letter or the assumptions upon which it was based; and there was no independent evidence introduced along the same lines such as expert opinions or testimony of lay persons who were familiar with the scenic values of the Parkway.

Early in this litigation, on January 10, 1964, affidavits by Stewart L. Udall, the Secretary of the Interior, and other officials of the Department of the Interior were filed in support of the government's motion for summary judgment. That motion was denied on February 28, 1964. Since the affidavit of the Secretary was not introduced into evidence, it cannot be considered by the Court; however, even if it were evidence in this case, it would give little support to the government's position. The pertinent parts of the affidavit are as follows:

\* \* \*

In my judgment, it would be contrary to the public interest to allow permanent commuter bus service upon the George Washington Memorial Parkway for the purpose of transporting passengers between the Virginia suburbs and the District of Columbia. The use of this Parkway by ever-increasing numbers of commuter buses with their great bulk, trucklike characteristics, and odors, as is contemplated by the Washington, Virginia & Maryland Coach Company, would, in my opinion, physically damage the scenic value of the Parkway. Further, other routes are available for transportation of passengers between the District of Columbia and the suburbs of Northern Virginia.

In my judgment, allowing permanent commuter bus service of the nature described above, would not be in the public interest, and would be inconsistent with the intendment of Congress.

\* \* \*

In addition to the fact that this opinion was not offered into evidence, nowhere does the Secretary attempt to justify the application of these alleged public interest factors to only *part* of the Parkway. Since the affidavit shows no recognition of the fact that on a daily basis more than 800 suburban commuter buses are operated by A. B. & W. on the Parkway below the Arlington Memorial Bridge, it loses any relevance to the issues as they are now before the Court. The basic problem in this case is no longer whether the preservation of scenic values, alone, would justify exclusion of commuter buses from the Parkway. The Court agrees that, as an abstract principle, the Secretary does have the authority to deny access by any class of commercial vehicle to all sections of the Parkway. Such a policy has been adopted by the Secretary with respect to trucks. They are not allowed on any sec-

tion of the Parkway except in special cases. However, the regulations which govern suburban commuter buses employ a double standard—depending upon which part of the Parkway is involved.

I find that regardless of the historical background of the various sections of the Parkway, it is now one Parkway—not two—and that the original congressional authorization for its construction and maintenance had the effect of combining and unifying all pre-existing parts of it, together with such extensions of it as may be added thereafter, into one continuous National Parkway.

To summarize the factual situation just presented, the evidence convinces me that the Park Service Regulations here in issue, except those as to fees and those designed to protect a short stretch of the Parkway which has weak construction and cannot withstand heavy bus traffic, discriminate against suburban commuter bus companies desiring to use the Parkway above Key Bridge. The regulations discriminate between Parkway use above Key Bridge when contrasted with Parkway use below Memorial Bridge; and with respect only to the Parkway above Key Bridge there is also a double standard—one for commuter buses and the other with respect to other buses rendering similar but not identical services such as airport buses.

## DISCUSSION

The issues of discrimination and unreasonableness must be analyzed within a legal framework which is fairly clear and about which all the parties seem to agree. The bus companies, citing Eastern Central Motor Carriers Ass'n v. United States, 239 F.Supp. 591, 594 (D.C. D.C.1965) maintain that the allegedly discriminatory regulations must be found invalid if they are without a rational, substantial or sound basis. Other cases are cited to the same effect.[1] Reliance

is also placed on Section 10 of the Administrative Procedure Act, 5 U.S.C. § 1009, which contains a general prohibition against administrative regulations or orders which are either " * * * arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law * * *."

The WMATC and the Virginia State Commission urge a similar standard. Citing Sproles v. Binford, 286 U.S. 374, 396, 52 S.Ct. 581, 76 L.Ed. 1167 (1932), and Lindsley v. Natural Carbonic Gas Co., 220 U.S. 61, 31 S.Ct. 337, 55 L.Ed. 369 (1911), the commissions contend in their brief that the regulations must be declared invalid if they "lack a rational basis."

This is precisely the same test which the government seeks to have applied in this case. "The judicial function is exhausted when there is found to be a rational basis for the conclusions approved by the administrative body." Miss. Valley Barge Co. v. United States, 292 U.S. 282, 286–287, 54 S.Ct. 692, 694, 78 L.Ed. 1260 (1934) (cited in the government's post-trial brief).

What the issue comes down to is this: In view of the broad discretion vested in the Secretary and the Park Service, and in view of the limited role of the reviewing Court, does the evidence show a rational basis for the regulations here in issue? I conclude that the evidence does not show a rational basis for the regulations as they now exist.

The first step in applying the "rational basis" test which the parties seem to agree upon, is a proper understanding of the facts; however, while searching the facts and circumstances of this case to find a rational basis for the regulations, just the contrary has become clear to the Court. First, the Court cannot understand how 52 daily suburban com-

1. Jenkins v. Macy, 237 F.Supp. 60, 62 (E.D. Mo.1964), affirmed 8 Cir., 357 F.2d 62; Irvin v. Hobby, 131 F.Supp. 851, 865 (N.D.Iowa 1955); NLRB v. Minnesota Min. & Mfg., 179 F.2d 323, 326 (8th Cir. 1950); and Willapoint Oysters v. Ewing, 174 F.2d 676, 695 (9th Cir. 1949) cert. denied 338 U.S. 860, 70 S.Ct. 101, 94 L.Ed. 527, rehearing denied, 339 U.S. 945, 70 S.Ct. 793, 94 L.Ed. 1360.

muter buses operated by W. V. & M. could be aesthetically objectionable when approximately 200 airport and C. I. A. commuter buses of the same style and size, operating over the same route, are not aesthetically objectionable. Second, the Court cannot understand how the government can, in good faith, request injunctive relief against these 52 daily bus trips when the Park Service allows more than 800 daily trips below Memorial Bridge by buses with identical physical characteristics and performing an identical service. Even without more, these facts establish the allegations that the regulations lack a rational basis and that they are discriminatory, unreasonable and therefore invalid.

The government, perhaps anticipating the Court's rejection of its contention that "preservation of scenic values" is, *per se*, a rational basis for the regulations, sought to establish that the Parkway is a scenic Parkway only above Key Bridge, with an older, multiple access "Highway" tacked onto its southern extremity. In addition to my finding that this is factually not true, the evidence establishes the contrary. In direct conflict with this contention is the fact that literally thousands of sightseeing bus trips are made every year on the Parkway south of the Memorial Bridge but that very rarely do any of them travel on any portion of the Parkway above Memorial Bridge. The activity of these sightseeing buses is strong evidence, contrary to the government's contention, that the Parkway below Memorial Bridge is a scenic attraction which equals and perhaps surpasses the newer section above Key Bridge.

In my opinion, the Secretary and the Park Service are "clearly wrong" and the weakness of the "scenic values" argument is "so manifest that the Court has no choice except to hold that the Secretary has exceeded his authority and employed means that are not at all appropriate to the end specified in the Act of Congress." [2]

In addition to the foregoing, something should be said about certain aspects of this case which may not be clearly presented on the record. The Court received the impression that there is more to this controversy than meets the eye. Because of the peculiar or unusual nature of certain cases it is often difficult to understand the "theory" upon which the respective parties are proceeding; however, in this case there were too many inferences to be drawn from the evidence—all pointing to the same problem—for the Court not to comment. My comments are also intended as an assurance to the parties that certain elements of the case did not go unnoticed by the Court.

The "buried problem" involves the whole question of adequate highways and mass transit facilities to handle the large and growing volume of commuter traffic in the District of Columbia metropolitan area. The problem is most acute in the Virginia suburbs because traffic to and from the District of Columbia must squeeze onto a few bridges across the Potomac River. This case presents a unique aspect of this problem because the Parkway provides direct access to Key Bridge, Theodore Roosevelt Memorial Bridge, Arlington Memorial Bridge and

2. Quoting from Boske v. Comingore, 177 U.S. 459, 470, 20 S.Ct. 701, 44 L.Ed. 846 (1900) (cited in the government's post-trial brief). The Act of Congress which is relevant here is the Act of August 25, 1916 (39 Stat. 535 as amended, 16 U.S.C. §§ 1, 3) which directs the Secretary of the Interior and the National Park Service to "promote and regulate the use of the Federal areas known as national parks * * * by such means and measures as conform to the fundamental purpose of the said parks, monuments, and reservations, which purpose is to conserve the scenery and the natural and historic objects and the wild life therein and to provide for the enjoyment of the same in such manner and by such means as will leave them unimpaired for the enjoyment of future generations." (16 U.S.C. § 1).

This Act also authorized the Secretary of the Interior to make "such rules and regulations as he may deem necessary or proper for the use and management of the parks, monuments, and reservations under the jurisdiction of the National Park Service." (16 U.S.C. § 3).

the "14th Street" Bridge, all of which provide Virginia commuters with direct access to the downtown area of the District of Columbia. The motion pictures which are in evidence amply support a finding of which the Court could take judicial notice anyway; that however one might view it, the Parkway is an extremely heavily travelled commuter highway. To the thousands of commuters who use it and to the officials who must regulate it, it is not a scenic parkway during weekday rush hours and no amount of wishful thinking can make it so without a drastic highway building program in suburban Virginia to ease the load on the Parkway.

The significance of this state of affairs is that the Secretary may have reasons quite apart from what he calls "scenic values" for the strange and discriminatory set of regulations which now prohibit suburban commuter buses from the northern portion of the Parkway. I seem to detect an implied warning, directed across the Potomac toward Virginia, and also toward the WMATC, that the Parkway cannot be relied upon, as it has been in the past, as a route to be used for easing the mounting pressure of commuter traffic, including mass transit, in lieu of new highways being opened.

I mention this latent element in this case because there undoubtedly must be more to the government's position than the "scenic values" and "old highway-new parkway" arguments which have been relied upon. These two theories do not have substantial evidence in the record to support them and they do not provide a rational basis for the unfair and discriminatory double standard regulations which presently apply to the suburban buses using the Parkway. These, nevertheless, are the contentions advanced by the government and I have no alternative but to invalidate this regulatory pattern in the absence of a rational basis in the evidence of record.

■ The government, on the other hand, has demonstrated a rational basis

for the fee requirement which applies to buses using the Parkway and to the prohibition against buses traveling on the structurally weak section of the Parkway between Key and Memorial Bridges. The cost of maintenance is a substantial and rational basis for these two aspects of the Parkway regulatory pattern.

■ As to the counterclaim by W. V. & M. in Civil Action No. 1172–63 (the first of these two actions, wherein the United States is plaintiff) requesting a return of $2,284.16 representing fees paid by W. V. & M. up to the time of trial, the Court concludes, as an alternative reason for denying this particular request, that it is without jurisdiction. This counterclaim is a demand against the United States and even though it is under $10,000.00 it does not state a claim under the Tucker Act, 28 U.S.C. § 1346 (a) (2), because it is not based on either an express contract or a contract implied in fact. It is therefore a claim for damages against the government without the government having given its consent to be sued. See Cobb v. Shore, 87 U.S.App. D.C. 162, 183 F.2d 980 (1950); State of Alabama v. United States, 282 U.S. 502, 506, 51 S.Ct. 225, 75 L.Ed. 492 (1931); United States v. Minnesota Mutual Investment Co., 271 U.S. 212, 217, 46 S.Ct. 501, 70 L.Ed. 911 (1926).

■ The Court concludes therefore that the Regulations of the Park Service are valid and have a rational basis except for those which deny W. V. & M. and D. C. Transit unlimited access to the Parkway above Key Bridge for their suburban commuter buses. So long as the regulations permit unlimited commuter bus use of the Parkway below Arlington Memorial Bridge, permits for such traffic above the Key Bridge must also be granted.

■ The regulations may exclude *all* commuter buses from the Parkway, but access or exclusion must not be discriminatory. Such regulations could

permit such traffic only during certain hours of the day or during all hours of the day, but whenever granted the present distinctions between buses using the northern and southern portions of the Parkway cannot be part of the regulatory pattern.

This opinion, together with the detailed Findings of Fact and Conclusions of Law annexed hereto as Appendix B shall constitute all of the findings of fact and conclusions of law in this case.

Counsel will submit an appropriate order.

APPENDIX A

## APPENDIX B

## FINDINGS OF FACT

(1) Title to the George Washington Memorial Parkway is vested in the United States. Administration of the Parkway is a responsibility of the National Capital Region of the National Park Service under the jurisdiction of the Secretary of the Interior. The Act of August 25, 1916 (39 Stat. 535, as amended, 16 U.S.C. § 3), authorized the Secretary of the Interior to make "such rules and regulations as he may deem necessary or proper for the use and management of the parks, monuments, and reservations under the jurisdiction of the National Park Service."

(2) Pursuant to Section 1 of the Act of August 25, 1916 (39 Stat. 535, 16 U.S.C. § 1), the National Park Service is directed to "promote and regulate the use of the Federal areas known as national parks * * * by such means and measures as conform to the fundamental purpose of the said parks, monuments, and reservations, which purpose is to conserve the scenery and the natural and historic objects and the wild life therein and to provide for the enjoyment of the same in such manner and by such means as will leave them unimpaired for the enjoyment of future generations."

(3) Following the opening of the George Washington Memorial Parkway from Spout Run to the C.I.A. Building on November 3, 1959, the Department of the Interior, on December 30, 1959 (24 Fed.Reg. 11019), adopted the following regulation [36 C.F.R. (1960 Rev.) 3.36 (b) (2)], with particular reference to the operation of commuter buses on the Parkway:

Passenger carrying buses for hire or compensation shall be permitted on the George Washington Memorial Parkway upon application for, and the granting of a permit by the Superintendent, National Capital Parks, issued on an annual basis, effective from April 1 until the following March 31, at the rate of $3 for each passenger-carrying seat in every vehicle so operated. Such permits may be issued (i) to provide passenger service on any portion between Mount Vernon and the Arlington Memorial Bridge, (ii) to provide limited direct non-stop passenger service between Key Bridge and the Central Intelligence Agency at Langley, Virginia, and (iii) to provide limited direct non-stop passenger service between the interchange at Route 123 and the Central Intelligence Agency Building at Langley, Virginia.

Subsequent to the publication of these regulations, the W. V. & M. Coach Company, on February 15, 1960, petitioned the Secretary for a modification thereof and a hearing on the petition. Such hearing was held on February 29, 1960; however, no report containing findings of fact, conclusions of law, or orders was ever served on W. V. & M.

(4) On April 18, 1960, the Interstate Commerce Commission [1] issued a certificate of public convenience and necessity to W. V. & M. to provide commuter bus service to the C. I. A. Building. This permit authorized W. V. & M. to travel over the Parkway between Arlington Memorial Bridge (Route 50) and the C. I. A. Building and it authorized bus travel over the Spout Run Parkway. A restriction in the permit stated that:

> The authority granted herein is subject to compliance by said carrier with any rules, regulations, or requirements which may be by law maintained or adopted by the Secretary of the Interior in connection with his administrative jurisdiction over matters relating to national parks.

(5) With the opening of the C. I. A. Building in the fall of 1961, W. V. & M. applied for a permit to "initiate express bus service over the George Washington Memorial Parkway to the C. I. A. Building at Langley, Va." Pursuant to the foregoing regulation, a Park Service permit was issued authorizing use of the Parkway, as requested, to furnish service to and from the C. I. A. Building only. The pertinent provisions of this permit were as follows:

> Permission is granted to operate buses on the following portions of the George Washington Memorial Parkway in accordance with existing regulations:
>
> 1. To provide limited direct non-stop passenger service between Key Bridge and the Central Intelligence Building at Langley, Virginia.

> 2. To provide limited direct non-stop passenger service between the interchange at Route 123 and the Central Intelligence Building at Langley, Virginia.

(6) For a short period of time in late 1961, W. V. & M. operated a bus service, as authorized by the Park Service permit and regulations, from downtown Washington to the C. I. A. Building and return. At this time, W. V. & M. provided suburban commuter bus service from the northern Virginia area to Washington by a scheduled route that proceeded down Highway 123, over the Parkway at a clover-leaf intersection, across Chain Bridge into the District of Columbia, and thence to downtown Washington.

(7) In the summer of 1962, it was ascertained that W. V. & M. had ceased to use the Parkway solely for commuter service to the C. I. A. Building. Instead, suburban commuters were picked up in Washington whose destination was beyond the C. I. A. Building, and these buses, after stopping at the C. I. A. Building, would proceed beyond that point into suburban Virginia to discharge passengers. On return runs, suburban commuters would be picked up by a bus that would stop at the C. I. A. and then proceed down the George Washington Memorial Parkway into Washington. Although the scheduled route via Route 123 and Chain Bridge was still used by W. V. & M., the unauthorized increase in Parkway use lessened the use of Route 123 and Chain Bridge.

(8) On November 16, 1962 (27 Fed. Reg. 11346), the applicable regulation [36 C.F.R. (1966 Supp.) 3.36 (b) (3) (i)] was amended. The provision relating to commuter buses was altered slightly to make clear that the service to the C. I. A. was to a "terminus" at the C. I. A. Building, with "direct return." In other words, this amendment was designed to make sure that W. V. & M. knew it was not authorized to use the Parkway for

---

1. The WMATC had not yet been created, thus, the I.C.C. still had jurisdiction over the commuter service rendered by W. V.

& M. between Virginia and the District of Columbia.

carrying passengers picked up or to be discharged beyond the C. I. A. Building.

(9) On November 16, 1962, a revised Park Service permit was issued to W. V. & M. to be effective until June 30, 1963. This permit merely modified the language of the previous permit to reflect the changes in the applicable regulation, that is, to plainly state that the Parkway use was limited to a "terminus" at the C. I. A. Building and "direct return" to Key Bridge.

(10) On December 14, 1962, W. V. & M. petitioned the Secretary for a modification of these regulations and for a hearing. This petition was denied on March 14, 1963, without explanation or further elucidation of the reasons for restricting commuter buses on the Parkway above Key Bridge. Meanwhile, W. V. & M. did not accept the revised permit and has since, despite objections made by representatives of the Department of the Interior, continuously exceeded the terms of the permit and the regulations by operating buses on the George Washington Memorial Parkway which carry suburban commuters and not limited to providing service only to the C. I. A. Building and direct return. For example, W. V. & M.'s Route 5–C picks up passengers as far away as Seven Corners, Virginia. This route, instead of proceeding east to the District of Columbia down U. S. Highways 29 and 211 through the center of Arlington and across Key Bridge, goes the opposite direction on those highways and eventually proceeds down Route 123, and the Parkway, to Key Bridge.

(11) On October 27, 1964, the WMATC issued a certificate of public convenience and necessity to W. V. & M., covering the Route 5–C, which prescribed use of the Parkway for transporting commuters to and from a large area of Northern Virginia. This certificate contained the following statement: "It is for the carrier to meet any requirements adopted by the Signatories and the Park Service pursuant to their 'normal and ordinary' police powers." Without meeting such requirements, W. V. & M. is, nevertheless, operating its Route 5–C as authorized only by the WMATC while contending that its failure to comply with Park Service Regulations is due to the invalidity of the regulations.

(12) For its part, D. C. Transit has authority from the WMATC to operate over the portion of the Parkway between the C. I. A. site and the Beltway (Interstate 495); however, the Park Service has refused to permit such operations. D. C. Transit, while objecting to this refusal by the Park Service, has refrained from using the Parkway.

(13) The regulations of the National Capital Region of the National Park Service (36 C.F.R. 3.36) authorize the issuance of general unlimited permits for commuter bus service on that portion of the Parkway between Mount Vernon and the Arlington Memorial Bridge. This unlimited use is in contrast to the limited use permitted north and west of the Key Bridge. The regulations also permit concession-authorized nonscheduled bus service to Dulles and National Airports for the accommodation of air travelers. Airport Transport, Inc., by a concession agreement with the Federal Aviation Authority, provides nonscheduled, direct, nonstop service between Dulles and downtown Washington, and between Dulles and National Airports for the accommodation of air travelers in the Washington area. Portions of the Parkway are used to provide this service to air travelers and Airport Transport holds a permit in connection with this use of the Parkway. The regulations also allow sightseeing buses to use any portion of the Parkway at any time upon obtaining a permit and payment of fees. The airport and sightseeing buses are not limited in their use of the Parkway to certain portions thereof; however, as a practical matter, almost all sightseeing bus traffic is south and east of the Arlington Memorial Bridge.

(14) The regulations of the Secretary of the Interior, since their amendment on December 30, 1959 [24 Fed.Reg. 11019, 36 C.F.R. (1960 Rev.) 3.36(b) (2)], have

not authorized the issuance of a permit to W. V. & M. to use the Parkway between Key Bridge and Arlington Memorial Bridge (Route 50). In practical effect, this means that buses providing direct service to and from the C. I. A. Building or suburban commuter service to outlying areas must enter and leave the District of Columbia via Key Bridge rather than via, the Roosevelt Bridge or the Arlington Memorial Bridge. These latter two bridges provide a quicker and more direct route between certain parts of suburban Virginia and much of the downtown area of Washington than does the Key Bridge. In addition, the regulations do not permit the operation of commuter buses down the Spout Run part of the Parkway which has the practical effect of requiring the buses which would otherwise use this section of the Parkway to use slower routes to reach either Key Bridge, Roosevelt Bridge or the Arlington Memorial Bridge.

(15) The section of the Parkway between the Key Bridge and the Arlington Memorial Bridge was constructed in 1937 and it does not have the same subsurface strength that underlies other portions of the Parkway. It is subject to seepage from the adjacent hillsides and breaks easier under the stresses of heavy traffic. It has been a maintenance problem and today shows evident signs of constant cracking and patching. It is considered by the Interior Department and the Park Service as not being capable of withstanding heavy bus traffic. At present no commuter buses are allowed on this portion of the Parkway. The limited amount of travel by Airport Transport, Inc. on this section is almost exclusively by limousine rather than by heavy buses. Sightseeing buses rarely use this or any other part of the Parkway above the Arlington Memorial Bridge.

### CONCLUSIONS OF LAW

(1) The Court has jurisdiction over all claims and counterclaims except for the counterclaim of W. V. & M. in Civil Action No. 1172–63 for the return of fees in the amount of $2,284.16 which have already been paid for the use of the Parkway.

(2) Park Service Regulations requiring the present and future payment of fees of one cent per vehicle mile for use of the Parkway by suburban commuter buses are reasonable, within the authority of the Secretary of the Interior to promulgate, have been adopted pursuant to the inherent police powers of the Secretary to regulate and maintain a government-owned national park, and they apply equally to all buses of the same class and therefore are not discriminatory. Thus, the claims seeking injunctive relief or declaratory injunctive relief against the Secretary of the Interior and the Regional Director of the National Park Service restraining them from present and future collection of fees are without merit and the Secretary of the Interior and the Regional Director of the National Park Service will not be enjoined from collecting such fees for such present and future use of the Parkway by suburban commuter buses as may be permitted.

(3) With respect to the counterclaim of W. V. & M. in the first action (Civil Action No. 1172–63) for the return of fees already paid, although the Court concludes that it has no jurisdiction over this counterclaim because it is a non-contractual money claim against the government without the government's consent to be sued, the Court also concludes, *assuming* it has jurisdiction, that the regulations pursuant to which these fees were paid were within the authority of the Secretary of the Interior to promulgate, they were adopted pursuant to the inherent police powers of the Secretary to regulate and maintain a government-owned national park, and they were applied equally to all buses of the same class and therefore they were not discriminatory. Thus, this counterclaim is without merit.

(4) The Act of September 15, 1960 (74 Stat. 1031, 1037), creating the Washington Metropolitan Area Transit Commission (the WMATC) with authority to issue certificates of public convenience and necessity and to prescribe routes

with respect to transportation for hire by motor vehicles in the Washington Metropolitan District, did not revoke by implication or supersede the authority of the Secretary of the Interior to promulgate reasonable regulations with respect to administration and use of the George Washington Memorial Parkway.

(5) The issuance of a certificate of public convenience and necessity by the WMATC authorizing a route over the George Washington Memorial Parkway is not in itself sufficient to permit operations on the Parkway. Use of the Parkway pursuant to such certificate is conditioned upon compliance with reasonable regulations promulgated by the Secretary of the Interior regarding such use and it is also conditioned upon the reasonable exercise of discretion by the Secretary of the Interior through the National Park Service in issuing permits for such use according to such reasonable regulations.

(6) The National Park Service Regulations promulgated by the Secretary of the Interior are unreasonable, arbitrary, capricious, discriminatory, and therefore invalid, insofar as they do not permit suburban commuter buses owned by W. V. & M. and D. C. Transit to operate without limitation on the Parkway above the Key Bridge including the Spout Run section pursuant to their certificates from the WMATC. The regulations are unreasonable, arbitrary, capricious, discriminatory and therefore invalid insofar as, and so long as, other regulations do permit suburban commuter buses owned by other bus companies to operate without limitation on the Parkway below the Arlington Memorial Bridge.

(7) To the extent that the Park Service Regulations are unreasonable, arbitray, capricious, discriminatory, and

therefore invalid, by allowing commuter buses to operate on the southern part of the Parkway but not on the portions above the Key Bridge, so, too, is any refusal of the Secretary of the Interior or any of his delegates, to issue permits to W. V. & M. and D. C. Transit for unlimited access to the Parkway above Key Bridge basing such refusal on such unreasonable, arbitrary, capricious, discriminatory, and invalid regulations.

(8) The claim of the United States in Civil Action No. 1172–63 for injunctive relief against W. V. & M. will be denied, and the claims of W. V. & M. and D. C. Transit seeking a declaration of invalidity as to the regulations which deny their suburban commmuter buses unlimited access to the Parkway north of Key Bridge will be granted because such regulations are invalid and will be invalid *so long as* they remain unreasonably discriminatory by allowing commuter buses unlimited access to the Parkway below Arlington Memorial Bridge while denying unlimited commuter bus use of the Parkway above the Key Bridge.

(9) The National Park Service Regulations promulgated by the Secretary of the Interior which do not permit *any* suburban commuter buses to use that section of the Parkway between the Arlington Memorial Bridge and the Key Bridge are reasonable and valid because of structural weakness and maintenance problems, but only *so long as all buses,* including sightseeing buses and airport buses (not including limousines), are similarly denied access. Accordingly, the claims of W. V. & M. seeking a declaration of invalidity as to the regulations which deny its suburban commuter buses any access to this portion of the Parkway will be denied.

(10) All parties shall bear their own costs.